# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-4145MN, 97-4241MN, 97-4220MN, 97-4224MN,
97-4226MN, 97-4331MN, 97-4334MN, 97-4361MN, 97-4362MN

_____

|  |  |  |
|---|---|---|
| _____ | * | |
| Nos. 97-4145MN, 97-4241MN | * | |
| _____ | * | |
|  | * | |
| Minnesota Milk Producers Association, | * | |
| a non-profit Minnesota corporation, | * | |
| individually, on behalf of themselves | * | |
| and others similarly situated; | * | |
| Bill Dropik, individually, on behalf of | * | |
| himself and others similarly situated; | * | |
| Chester Kolstad, individually, on behalf | * | |
| of himself and others similarly situated; | * | |
| Greg Radermacher, individually, on | * | On Appeal from the United |
| behalf of himself and others similarly | * | States District Court |
| situated; Arnold Ness, individually, on | * | for the District of |
| behalf of himself and others similarly | * | Minnesota. |
| situated; Fredrick J. Bianchi, | * | |
| individually, on behalf of himself and | * | |
| others similarly situated; Marlon Restad, | * | |
| individually, on behalf of himself and | * | |
| others similarly situated; Delbert | * | |
| Mandelko, individually, on behalf of | * | |
| himself and others similarly situated; | * | |
| John Fischer, individually, on behalf of | * | |
| himself and others similarly situated; | * | |
| Lee Johnston, individually, on behalf of | * | |
| himself and others similarly situated; | * | |
| Leslie Kyllo, individually, on behalf of | * | |

himself and others similarly situated;                 *
James Muzzy, individually, on behalf                   *
of himself and others similarly situated,              *
                                                       *
         Appellees/Cross-Appellants,                   *
                                                       *
         v.                                            *
                                                       *
Dan Glickman, Secretary, United States                 *
Department of Agriculture,                             *
                                                       *
         Appellant/Cross-Appellee.                     *
                                                       *
                                                       *
         _____                                 *
                                                       *
         No. 97-4220MN                                 *
         _____                                 *
                                                       *
Minnesota Milk Producers Association,                  *
a non-profit Minnesota corporation,                    *
individually, on behalf of themselves                  *
and others similarly situated; Bill                    *
Dropik, individually, on behalf of                     *
himself and others similarly situated;                 *
Chester Kolstad, individually, on behalf               *   On Appeal from the United
of himself and others similarly situated;              *   States District Court
Greg Radermacher, individually, on                     *   for the District of
behalf of himself and others similarly                 *   Minnesota.
situated; Arnold Ness, individually, on                *
behalf of himself and others similarly                 *
situated; Fredrick J. Bianchi,                         *
individually, on behalf of himself and                 *
others similarly situated; Marlon Restad,              *
individually, on behalf of himself and                 *
others similarly situated; Delbert                     *
Mandelko, individually, on behalf of                   *

-2-

himself and others similarly situated;  *
John Fischer, individually, on  *
behalf of himself and others similarly  *
situated; Lee Johnston, individually, on  *
behalf of himself and others similarly  *
situated; Leslie Kyllo, individually, on  *
behalf of himself and others similarly  *
situated; James Muzzy, individually, on  *
behalf of himself and others similarly  *
situated,  *
                                         *
                   Appellees,  *
                                         *
        v.  *
                                         *
                                         *
Southeast Dairy Farmers Association;  *
and United Dairymen of Arizona,  *
                                         *
                   Appellants.  *
                                         *
                                         *
                                         *
        _____  *
                                         *
        No. 97-4224MN  *
        _____  *
                                         *
Minnesota Milk Producers Association,  *
a non-profit Minnesota corporation,  *
individually, on behalf of themselves  *
and others similarly situated; Bill  *
Dropik, individually, on behalf of  *
himself and others similarly situated;  *
Chester Kolstad, individually, on behalf  *
of himself and others similarly situated;  *
Greg Radermacher, individually, on  *
behalf of himself and others similarly  *

situated; Arnold Ness, individually, on behalf of himself and others similarly situated; Fredrick J. Bianchi, individually, on behalf of himself and others similarly situated; Marlon Restad, individually, on behalf of himself and others similarly situated; Delbert Mandelko, individually, on behalf of himself and others similarly situated; John Fischer, individually, on behalf of himself and others similarly situated; Lee Johnston, individually, on behalf of himself and others similarly situated; Leslie Kyllo, individually, on behalf of himself and others similarly situated; James Muzzy, individually, on behalf of himself and others similarly situated,

    Appellees,

  v.

National Farmers Organization ("NFO"),

    Appellant.

   _____

   No. 97-4226MN
   _____

Minnesota Milk Producers Association, a non-profit Minnesota corporation,

* On Appeal from the United States District Court for the District of Minnesota.

individually, on behalf of themselves and others similarly situated; Bill Dropik, individually, on behalf of himself and others similarly situated; Chester Kolstad, individually, on behalf of himself and others similarly situated; Greg Radermacher, individually, on behalf of himself and others similarly situated; Arnold Ness, individually, on behalf of himself and others similarly situated; Fredrick J. Bianchi, individually, on behalf of himself and others similarly situated; Marlon Restad, individually, on behalf of himself and others similarly situated; Delbert Mandelko, individually, on behalf of himself and others similarly situated; John Fischer, individually, on behalf of himself and others similarly situated; Lee Johnston, individually, on behalf of himself and others similarly situated; Leslie Kyllo, individually, on behalf of himself and others similarly situated; James Muzzy, individually, on behalf of himself and others similarly situated,

* * * * * * * * * * * * * * * * * * * * * *

Appellees,

v.

Association of Dairy Cooperatives in the Northeast ("ADCNE"),

Appellant.

On Appeal from the United States District Court for the District of Minnesota.

-5-

_____

No. 97-4331MN

_____

| | |
|---|---|
| Minnesota Milk Producers Association, a non-profit Minnesota corporation, individually, on behalf of themselves and others similarly situated; Bill Dropik, individually, on behalf of himself and others similarly situated; Chester Kolstad, individually, on behalf of himself and others similarly situated; Greg Radermacher, individually, on behalf of himself and others similarly situated; Arnold Ness, individually, on behalf of himself and others similarly situated; Fredrick J. Bianchi, individually, on behalf of himself and others similarly situated; Marlon Restad, individually, on behalf of himself and others similarly situated; Delbert Mandelko, individually, on behalf of himself and others similarly situated; John Fischer, individually, on behalf of himself and others similarly situated; Lee Johnston, individually, on behalf of himself and others similarly situated; Leslie Kyllo, individually, on behalf of himself and others similarly situated; James Muzzy, individually, on behalf of himself and others similarly situated,<br><br>    Appellees, | On Appeal from the United States District Court for the District of Minnesota. |

-6-

v.           *
                      *
                      *

Texas Association of Dairymen; Dairy    *
Producers of New Mexico; Lone Star    *
Milk Producers, L.C.; and Premier Milk   *
Producers, Inc.,                 *
                      *
       Appellants.           *
                      *
                      *

      _____        *
                      *
      No. 97-4334MN        *
      _____        *
                      *

Minnesota Milk Producers Association,   *
a non-profit Minnesota corporation,     *
individually, on behalf of themselves     *
and others similarly situated;        *
Bill Dropik, individually, on behalf of    *
himself and others similarly situated;    *
Chester Kolstad, individually, on behalf   *
of himself and others similarly situated;   *
Greg Radermacher, individually, on    *    On Appeal from the United
behalf of himself and others similarly    *    States District Court
situated; Arnold Ness, individually, on   *    for the District of
behalf of himself and others similarly    *    Minnesota.
situated; Fredrick J. Bianchi,        *
individually, on behalf of himself and    *
others similarly situated; Marlon Restad, *
individually, on behalf of himself and    *
others similarly situated; Delbert      *
Mandelko, individually, on behalf of    *
himself and others similarly situated;    *
John Fischer, individually, on behalf of   *
himself and others similarly situated;    *
Lee Johnston, individually, on behalf of   *

himself and others similarly situated;                    *
Leslie Kyllo, individually, on behalf of                  *
himself and others similarly situated;                    *
James Muzzy, individually, on behalf                      *
of himself and others similarly situated,                 *
                                                          *
        Appellees,                                          *
                                                          *
        v.                                                  *
                                                          *
National Farmers Organization, Inc.                       *
(NFO); and Association of Dairy                            *
Cooperatives in the Northeast,                            *
                                                          *
        Appellants.                                         *
                                                          *
                                                          *
        _____                             *
                                                          *
    Nos. 97-4361MN, 97-4362MN                             *
        _____                             *
                                                          *
Minnesota Milk Producers Association,                     *
a non-profit Minnesota corporation,                       *
individually, on behalf of themselves                     *
and others similarly situated; Bill                       *
Dropik, individually, on behalf of                        *
himself and others similarly situated;                    *
Chester Kolstad, individually, on behalf                  *
of himself and others similarly situated;                 *
Greg Radermacher, individually, on                        *
behalf of himself and others similarly                    *
situated; Arnold Ness, individually, on                   *
behalf of himself and others similarly                    *
situated; Fredrick J. Bianchi,                            *
individually, on behalf of himself and                    *
others similarly situated; Marlon Restad,                 *

individually, on behalf of himself and    \*
others similarly situated; Delbert    \*
Mandelko, individually, on behalf of    \*
himself and others similarly situated;    \*
John Fischer, individually, on    \*
behalf of himself and others similarly    \*
situated; Lee Johnston, individually, on    \*
behalf of himself and others similarly    \*
situated; Leslie Kyllo, individually, on    \*
behalf of himself and others similarly    \*
situated; James Muzzy, individually, on    \*
behalf of himself and others similarly    \*
situated,    \*

        Appellees,    \*

   \*    On Appeal from the United

     v.    \*    States District Court

   \*    for the District of

Louisiana Department of Agriculture    \*    Minnesota.
and Forestry; Alabama Department of    \*
Agriculture and Industries; Arkansas    \*
Livestock and Poultry Commission;    \*
Colorado Department of Agriculture;    \*
Georgia Department of Agriculture;    \*
Kentucky Department of Agriculture;    \*
Maine Department of Agriculture,    \*
Food and Rural Resources;    \*
Massachusetts Department of Food    \*
and Agriculture; Mississippi    \*
Department of Agriculture and    \*
Commerce; New Hampshire Department    \*
of Agriculture, Markets and Food;    \*
New Mexico Department of Agriculture;    \*
North Carolina Department of    \*
Agriculture; South Carolina Department    \*
of Agriculture; State of Vermont; and    \*
Washington Department of Agriculture,    \*
   \*
        Appellants.    \*

_____

Submitted: February 8, 1998

Filed: August 13, 1998
_____

Before RICHARD S. ARNOLD,[1] Chief Judge, McMILLIAN and LOKEN, Circuit
    Judges.

_____

RICHARD S. ARNOLD, Chief Judge.


    The Minnesota Milk Producers Association (MMPA) challenges the Secretary of Agriculture's system for pricing "Class I" milk under the Agricultural Marketing Agreement Act of 1937 (AMAA), 7 U.S.C. §§ 601 et seq. (1994). The District Court held that one aspect of the pricing system -- the "differential" -- was unlawful and the Secretary's decision to maintain its operation unsubstantiated, and therefore enjoined the Secretary from enforcing this price component in most of the country's milk-marketing areas. The Court upheld the other component of the Class I price -- the "base price." Subsequently, the Court denied the post-judgment motions of other producer organizations and numerous state agencies for intervention, as well as for relief from judgment. On the Secretary's motion, it stayed the injunction pending appeal. We extended the stay until this decision.

    The Secretary of Agriculture appeals the Court's holding that the differential component of the Class I milk price is unlawful, and that the Secretary's decision to maintain it was arbitrary and capricious. On cross-appeal, the MMPA challenges the

_____

[1]The Hon. Richard S. Arnold stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998. He has been succeeded by the Hon. Pasco M. Bowman II.

Court's upholding of the base-price component of the Class I milk price. The various movants appeal the Court's denial of their post-judgment motions.

We hold that the Secretary's decision to maintain the current system for pricing Class I milk was within his discretion, and therefore reverse the portions of the District Court's order that hold otherwise. We affirm the denial of intervention, and other post-judgment relief, to the various movants.

## I. BACKGROUND

### A. General

A brief examination of the milk industry and the development of milk price regulation is helpful to understand the issues on appeal. As the Supreme Court has explained, "two distinctive and essential phenomena of the milk industry" create the potential for market disequilibrium. Zuber v. Allen, 396 U.S. 168, 172 (1969). The first is that the price of raw milk depends on its end use. The second is that production yield varies seasonally, resulting in oversupply in summer months. Absent regulation or coordination, therefore, the milk market is vulnerable to destabilizing competition among producers to sell for the highest-price use, on the one hand, and inequitable bargaining power favoring buyers, on the other.

Ultimately, these market characteristics led to the establishment, as part of the AMAA,[2] of federal milk regulation through marketing orders. The statute was intended "to raise producer prices" and "to ensure that the benefits and burdens of the milk

---

[2]The Agricultural Market Transition Act of 1996 includes provisions reforming the scheme of milk price regulation. 7 U.S.C.A. § 7253 (West Supp. 1998). Accordingly, the Secretary has proposed new rules, 63 Fed. Reg. 4802-01 (1998), and solicited comments. However, because he has not yet effected any changes to the present system, we proceed with our consideration of this appeal under the AMAA.

market are fairly and proportionately shared by all dairy farmers." Block v. Community Nutrition Inst., 467 U.S. 340, 342 (1984) (citation omitted).

First, as to raising producer prices, the statute requires the Secretary to classify milk according to its end use, and to provide a method for fixing minimum prices for each classification in each marketing area. The minimum prices are to be uniform as to all handlers, subject only to certain adjustments for: "(1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." 7 U.S.C. § 608c(5)(A).

Accordingly, the Department of Agriculture uses three end-use classifications for milk products: Class I denotes fluid milk, Class II soft manufactured products, and Class III hard, storable manufactured products. The minimum-price calculation for each classification begins with a base price -- known as the Minnesota-Wisconsin (M-W) price[3] -- representing the competitive value of milk used for manufacturing purposes. Specifically, the base price is the average price paid to milk producers for Class III milk in Minnesota and Wisconsin by plants producing manufactured products. Class III milk is then priced at the base price; Class II milk at the base price plus a differential that is uniform in all areas; and Class I milk at the base price plus an area-specific differential that is intended to stimulate nonlocal producers to supply that area sufficiently.

Second, regarding the equitable distribution of sale proceeds, the statute requires the Secretary to ensure that all milk producers supplying a particular marketing area be

---

[3]After the decision of the Secretary at issue here, a slightly modified version of the M-W price began to be used as the base price. The parties agree that the modifications are not relevant to our consideration of the base price herein.

paid a uniform price, "irrespective of the uses made of such milk by the individual handler to whom it is delivered," subject to certain adjustments. 7 U.S.C. § 608c(5)(B)(ii).[4]

The current system operates as a settlement fund based on a uniform "blend price." The blend price is calculated as the weighted average of the minimum prices of the three classes of milk. All handlers in a marketing area pay the blend price to producers supplying that area, regardless of the classification of the milk they are buying. For Class I milk, whose minimum price is higher than the blend price, the handler pays the difference into the settlement fund. For Class II and III milk, whose minimum prices are lower than the blend price, the handler withdraws the difference from the fund. In this way, all producers supplying a marketing area receive the same price, yet all handlers pay at least the minimum price specifically applicable to the milk's end use.

*B. Class I Differentials*

The subject of this dispute is the pricing of Class I milk. The current computation -- base price plus an area-specific Class I differential -- has been used since the 1960s. Until then, during the first 25 years of the milk-marketing-order program, "[t]he independence of markets . . . made it easier to deal with local changes in supply and demand." Agricultural Marketing Service, U.S. Department of Agriculture, Marketing Bulletin No. 27, The Federal Milk Marketing Order Program 34. In the 1960s, however, "[a]dvances in transportation and refrigeration facilitated the movement of milk between markets and, thus, markets began to lose many of their local characteristics. The ability of handlers to obtain their supply of milk from sources

---

[4]In the alternative, the Secretary may provide "for the payment to all producers . . . delivering milk to the same handler of uniform prices for all milk delivered by them," subject to producer approval. 7 U.S.C. § 608c(5)(B)(i).

-13-

outside the traditional milkshed made it necessary to give more weight to the cost of alternative milk supplies in establishing the Class I price level for a market. The increased mobility of milk made national supply-demand conditions an important factor in the supply-demand conditions of local markets. . . . Class I prices [came to be] viewed as a coordinated system of prices for the various markets . . .." Id. Therefore, "[c]hanges in individual order prices usually are made only in the context of a system of prices for all markets." Id.

The last such changes before 1985 occurred in 1968. Thereafter, no significant changes were made, in part because markets "remained adequately supplied at existing Class I price levels. When supplies have tightened, cooperatives have obtained over-order[-minimum] payments to help cover the cost of importing needed supplies." Id. at 35.

However, in 1985, Congress found that the then-existing Class I differentials were not high enough to accomplish their goal of adequate supply by nonlocal producers:

> The last major changes made by the Department of Agriculture to Class I price differentials were in the late 1960s. Since costs, including transportation, assembly, and handling, have increased substantially during that time, the Committee feels it is necessary to adjust the fluid milk differentials in 35 of the 44 federal milk orders so that the prevailing minimum order prices will better cover the cost of supplying these markets. This action will reduce the need for over-order payments and providing [sic] equity among handlers supplying the market.

H.R. Rep. No. 99-271(I), at 22, reprinted in 1985 U.S.C.C.A.N. 1103, 1126.

Congress therefore amended the AMAA to address specifically the pricing of "milk of the highest use classification," in § 608c(5)(A). That provision fixes "the

-14-

minimum aggregate amount of the adjustments, under clauses (1) and (2) [customary and quality adjustments]" at levels ranging from $1.20 (for the Upper Midwest) to $4.18 (for Southeastern Florida) per hundredweight, representing increases for 35 of the 44 orders. These minimum differentials were to be effective "[t]hroughout the 2-year period beginning on [December 23, 1985] (and subsequent to such 2-year period unless modified by amendment to the order involved)." The differentials have not since been amended, by either Congress or the Secretary.

## II.  HISTORY OF THE CASE

In 1990, the MMPA sought a declaration that the Secretary's pricing of Class I milk violated the AMAA, and an injunction ordering him to hold hearings on amendments.[5]  It claimed that the Class I differentials depend solely on a marketing area's distance from the Upper Midwest -- specifically, Eau Claire, Wisconsin.  It further claimed that § 608c(18) of the AMAA requires the differentials to reflect economic factors specific to each marketing area.  Therefore, it alleged, the differentials violate § 608c(18).  Moreover, the complaint alleged that in each marketing area this differential system resulted in a windfall to producers who are located closer than the Upper Midwest producers, but who nevertheless receive a differential reflecting the full cost of transport from the Upper Midwest.  The MMPA claimed that the excess production thereby stimulated is channeled into Class II and III products, and thus drives down the blend price, thereby lowering the M-W base price as well, and causing harm to the Upper Midwest producers.  The MMPA alleged that the Secretary's system thus created disorderly marketing conditions, in further violation of the AMAA.

The District Court initially dismissed the action, holding that the Secretary's decision to enforce the differential pricing system was unreviewable, and that the

_____

[5]It also brought claims related to other aspects of the Secretary's milk orders, claims which are not now before us.

-15-

MMPA did not have standing. We reversed. <u>Minnesota Milk Producers Ass'n v. Madigan</u>, 956 F.2d 816 (8th Cir. 1992). In the meantime, the Secretary had begun rulemaking hearings on the milk-pricing system. On remand, the District Court stayed proceedings until the completion of the proceedings.

In 1993, the Secretary concluded that no changes to the Class I differentials were warranted, and rejected the numerous proposals for change that had been presented during the hearings, including that of the Upper Midwest Federal Order Coalition (UMFOC), of which the MMPA is a member. Milk in the New England and Other Marketing Areas; Decision on Proposed Amendments to Tentative Marketing Agreements and Orders, 58 Fed. Reg. 12634 (1993) [Secretary's Decision I]. Part of this decision undertook an order-by-order review in which the Secretary classified each area as deficit, balanced, or surplus, and concluded that, under the current system, most were balanced. The MMPA then moved for summary judgment, asking the Court to declare the existing differential system unlawful and to order the Secretary to change it.

The District Court found that it was unable to determine whether the Secretary's decision to retain the statute's differentials was supported by substantial evidence because "explicit findings and explanations were not issued relative to the 608c(18) factors." District Court Order at 19 (April 14, 1994). It remanded the decision to the Secretary, with instructions to issue an amplified decision "setting forth findings of fact and explanations for his conclusions regarding proposed amendments to the Class I pricing provisions of the federal milk marketing order." <u>Id.</u> at 23.

The Secretary issued an amplified decision on August 17, 1994. Milk in the New England and Other Marketing Areas; Amplified Decision, 59 Fed. Reg. 42422 (1994) [Secretary's Decision II]. The decision explained that the market-specific factors of § 608c(18) were automatically accounted for in the other component of the

Class I price, the M-W base price, and that the Class I differential addressed the further variable of transportation cost.

The Secretary's explanation was again found inadequate. The District Court found that the pricing system was based on a single point of origin, and that "the Secretary may not enforce what is clearly a single basing-point system without explaining how it reflects full and reasoned consideration of the statutory factors." District Court Order at 7 (May 16, 1996). It remanded the decision a second time, ordering another amplified decision, which would reflect "specific and reasoned consideration of the [§ 608c(18)] factors" in the Secretary's decision regarding both the Class I differential and the base price. Id. at 13.

The Secretary issued a second amplified decision on September 18, 1996. Milk in the New England and Other Marketing Areas; Second Amplified Decision, 61 Fed. Reg. 49081 (1996) [Secretary's Decision III]. He refuted the characterization of the Class I differential system as being based from a single point of origin and explained why the M-W price was a good measure of supply and demand.

The MMPA again moved for summary judgment. The District Court declared that the Class I differentials in "all surplus and balanced marketing orders and all deficit orders that do not rely on direct shipments of alternative milk supplies from the Upper Midwest or from other deficit orders which in turn rely on the Upper Midwest for replacement supplies" were unlawful because the Secretary had failed to consider the § 608c(18) factors. District Court Order at 14 (Nov. 3, 1997). It enjoined the Secretary from enforcing the differentials, and held the Secretary's initial and two amplified decisions to be arbitrary and capricious. However, it upheld the Secretary's finding that the M-W base price satisfied the § 608c(18) criteria.

# III. JUSTICIABILITY

We address first the Secretary's argument that the MMPA had neither a cause of action nor standing to bring this action. See Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012 (1998) (rejecting the doctrine of "hypothetical jurisdiction," which allows a court to "proceed immediately to the merits question . . . at least where . . . the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied"). We rejected these positions in our prior decision. Those holdings are now the law of the case, and because they were not "clearly erroneous" and would not "work a manifest injustice," we decline to disturb them. Liberty Mutual Ins. Co. v. Elgin Warehouse and Equip., 4 F.3d 567, 570-71 (8th Cir. 1993).

# IV. THE CLASS I DIFFERENTIAL

## A. Standard of Review

Our review of the Secretary's decision to maintain the existing system of Class I differentials is governed by Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the Chevron standard, the first inquiry is "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If the statute does not provide specific guidance, we then consider "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

## 1. The Statutory Responsibilities of the Secretary Regarding Amendment

We hold that the AMAA has not spoken directly to the specific issue of when and how the Secretary should seek to amend the Class I differentials prescribed by Congress in § 608c(5). Section 608c(5)(A) provides that its differentials will remain unchanged "unless modified by amendment to the order involved." However, it does

not require the Secretary to propose or adopt any such amendment within any particular time. Moreover, the plain language of the statute weighs against the MMPA's assertion that "[t]he 1985 Act only relieved the Secretary of the duty of monitoring the Class I prices for compliance with the § 608c(18) pricing mandates for the two years in which the Act explicitly prohibited modification," Appellees' Br. (in Nos. 97-4145, 97-4241) at 32, even accepting its contention that the 1985 amendments were implemented "within an Act designed to permanently reduce surplus production of milk." Appellees' Br. (in Nos. 97-4220, 97-4224, 97-4226, 97-4331, 97-4334, 97-4361, 97-4362) at 22.

The crux of the MMPA's argument lies in § 608c(18) of the statute, but this reliance is misplaced. Section 608c(18) lays down requirements that the Secretary must meet before changing or amending marketing agreements or orders: "prior to prescribing any term in any marketing agreement or order, or amendment thereto, . . . or prior to modifying the price fixed in any such term." In that case -- that is, when the Secretary wishes to amend an order -- he must then:

> ascertain the parity prices of [the milk]. The prices which it is declared to be the policy of Congress to establish in section 602 of this title [setting forth goals of statute] shall . . . be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates. *Whenever the Secretary finds* . . . that the parity prices of such commodities are not reasonable in view of [these economic conditions], he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest. Thereafter, *as the Secretary finds necessary* on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

(Emphases added.) In this case, the Secretary has not found that the prices set by Congress are unreasonable, nor that changed circumstances make adjustments necessary. The statute leaves that decision to his discretion.

The MMPA also contends that other sections of the statute -- specifically § 608c(3), § 608c(16)(A), and § 608c(17) -- "place a burden on the Secretary to continuously monitor the orders and their impact to ensure that they effectuate the stated purposes of the AMAA and comply with its substantive provisions." Appellees' Br. (in Nos. 97-4145, 97-4241) at 6-7. We find the contention overstated. Section 608c(3) requires the Secretary to give notice of and opportunity for hearing on a proposed order "*[w]henever [he] has reason to believe* that the issuance of an order will tend to effectuate the declared policy of this chapter." (Emphasis added.) Section 608c(16)(A)(i) provides that "the Secretary of Agriculture shall, *whenever he finds* that any order issued under this section . . . obstructs or does not tend to effectuate the declared policy of this chapter, terminate or suspend the operation of such order. . . ." (Emphasis added.) These provisions, like § 608c(18), are implicated only after the Secretary has decided that changes to the marketing orders are warranted, a situation this case does not present. Similarly, § 608c(17) requires only that the Secretary hold a hearing under specific conditions -- "if one-third or more of the producers as defined in a milk order apply in writing for a hearing on a proposed amendment of such order . . . [and] if the proposed amendment is one that may legally be made to such order" -- that do not amount to an ongoing general duty of monitoring and adjustment. Ultimately, the only provision specific to milk price regulation that addresses the Secretary's duty to amend is § 608c(1): "The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders . . .." We cannot hold this statement to be a specific directive.

Nor does a specific duty of adjustment arise from the general precatory statements of policy in §§ 602(1) and (4), which require the Secretary to "establish and maintain . . . orderly marketing conditions" effectuating the statute's goals of parity

prices and orderly flow of market supply. These provisions are generally applicable to all the agricultural commodities covered by the AMAA, and cannot override the statutory scheme specifically devised for the regulation of milk, which has left the initiation of amendment to the Secretary's discretion.

We therefore hold that Congress has placed no specific conditions on the Secretary's power to maintain the status quo. Specifically, to apply § 608c(18) to the Secretary's decision not to pursue amendment -- that is, to hold that the Secretary may not decline to change the differentials unless he finds that the differentials prescribed in the statute are still valid under current economic conditions -- would reverse the statute's intended procedure for amendment. The burden, that is, is on those who advocate change to show that it is required; it is not on the Secretary to show that no change is necessary.

*2.     Deferential Review*

The Secretary's decision not to amend is therefore "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron v. Natural Resources Defense Council, Inc., 467 U.S. at 844. See also 5 U.S.C. § 706 (1994). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

In this case, several considerations add to the already "considerable weight [that] should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." Chevron, 467 U.S. at 844 (footnote omitted). First, the Supreme Court itself has noted the intricacy of "the labyrinth of the federal milk marketing regulation provisions." Zuber v. Allen, 396 U.S. at 172. "A court's deference to

-21-

administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority." Blair v. Freeman, 370 F.2d 229, 232 (D.C. Cir. 1966).

Second, Congress, not the Secretary, established the existing differentials, and we must presume them lawful and effective to reach the statute's goals. That the dairy provisions of the Agricultural Market Transition Act of 1996, 7 U.S.C.A. § 7253 (West Supp. 1998), do not reject the differential system outright indicates that Congress continues to deem it an acceptable, if not necessarily the preferred, system. The 1996 statute requires the Secretary to amend and consolidate the milk marketing orders and specifically identifies as relevant issues "(A) [t]he use of utilization rates and multiple basing points for the pricing of fluid milk [and] (B) [t]he use of uniform multiple component pricing when developing 1 or more basic formula prices for manufacturing milk." 7 U.S.C.A. § 7253(a)(3). Though it prohibits the Secretary from considering, or basing any decision on, the Class I differentials currently set by § 608c(5)(A), 7 U.S.C.A. § 7253(a)(4), the new statute does not preclude him from reinstituting transportation-based differentials more generally. We therefore believe that the current system should continue to be given especial deference as the product of legislative judgment.

Third, the burden in this case is upon the MMPA to show that a change was required, and not upon the Secretary to defend his decision to retain the status quo. We have held that the Secretary bears the burden of presenting substantial evidence when he seeks amendment of a milk order. Walmsley v. Block, 719 F.2d 1414 (8th Cir. 1983). When another party, here the MMPA, is the proponent of amendment, it should bear the same burden. See also 5 U.S.C. § 556(d) (in formal rulemaking, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof"). The inquiry therefore is not whether the Secretary established that the differentials should remain unchanged, but whether the MMPA established that they

should not. The deference due the Secretary's decision is the greater for the MMPA's failure to follow through, before the District Court and on this appeal, with its initial proposal for change, leaving it in the weak position of attacking the present system without presenting an alternative.

Finally, case law suggests that agency inaction is presumptively unreviewable. "An agency's decision not to take enforcement action should be presumed immune from judicial review . . .." Heckler v. Chaney, 470 U.S. 821, 832 (1985). "The general exception to reviewability provided by [5 U.S.C.] § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." Id. at 838. Though the untaken action in this case is amendment, and not enforcement, the principle remains that a decision to do nothing is entitled to more deference than a decision to act.

## B. The Lawfulness of the Secretary's Decision

We believe that the Secretary's decision to maintain the existing Class I differentials was not arbitrary and capricious. The record indicates that the Secretary based his decision on numerous factors relevant to the statute's goals of "insur[ing] a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest," 7 U.S.C. § 608c(18), and further that his decision was not a "clear error of judgment." See Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 416 (in deciding whether agency action was arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

The Secretary's 1990 rulemaking hearings, which were held at various locations throughout the country and lasted 43 days in all, encompassed careful consideration of the Class I differential system. Thirty-five proposals for amendment were considered,

> portray[ing] a wide range of views regarding how Federal orders should be changed or not changed. Altogether, nearly 200 persons, including dairy farmers, cooperative association representatives, members of other general farm organizations, proprietary handlers, state officials, members of the United States Congress, and others, testified at the hearing. Thus, the record contains the views and testimony of a broad cross-section of the dairy industry and other interested parties.

Secretary's Decision I at 12645.

The Secretary considered the proposals of the Midwest producers, as well as opposing testimony from other hearing participants. He noted that Midwestern producers held markedly different views from the country's other producers:

> In general, the testimony reflects one of two basic views. The first is one of basic support for the order program as is. This point of view was expressed by virtually all parties from areas of the country other than the Midwest. . . . The second point of view reflected in the testimony of most parties from the Midwest also expressed strong support for the Federal order program, but was critical of the system of Class I prices that now operates in all the orders.

Secretary's Decision I at 12645. The relative unpopularity of the Midwest's views was relevant, in light of the statute's requirement that no amending order be effective without the approval of at least two-thirds of the producers who supply the marketing area, or of producers who produce at least two-thirds of the milk in the marketing area. 7 U.S.C. § 608c(8), (9).

-24-

The hearings included analysis of "the supplies and utilization of producer milk . . . order by order and region by region." Id. at 12646. This analysis showed that:

> (1) The [12] orders in the Southeast . . . have very high levels of Class I use . . .[,] low levels of Class II . . . and very low Class III utilizations. Some of these markets are deficit markets, that is, they do not produce enough milk to supply the Class I needs, including reserves on a year-round basis. (2) [Seven] Midwest and Far West and Northwest markets . . . have far more milk available than is needed for Class I and Class II use, plus reserves. . . . (3) The remaining [21] markets exhibit essentially a balance between supply and demand. . . ."

Id. at 12647. These findings were relevant to whether the statute was achieving its goal of ensuring an adequate supply in each marketing area. The meaning of these findings is contested by the parties. In particular, MMPA contends that there is an inherent contradiction in using differentials to encourage the movement of milk into balanced or surplus marketing orders. However, the Secretary articulated "a rational connection between the facts found and the choice made," Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Ins. Agency, 463 U.S. 29, 43 (1983) (citation omitted): that the Class I differentials were at least partially responsible for keeping those markets out of deficit. We therefore defer to the Secretary's interpretation of the marketing data.

The Secretary's decision also addressed more technical aspects of the Class I differential system, including those now raised by the MMPA on appeal. For example -- in response to exceptions filed by the UMFOC, representing the MMPA -- it discussed the measurement of reserve, supply, and demand, as well as the marketing efficiency of the Class I pricing system. Id. at 12647-49. This discussion showed consideration of further relevant factors. We believe that it was not then "clear error" for the Secretary to conclude:

> [T]he present Class I differential should remain in place. The underlying basis for the level of Class I prices under the order program is the statutory pricing standard which requires that prices reflect the supply and demand for milk. Within this context, the present Class I differentials appear to be set at a reasonably satisfactory level. Although there might be a basis for some downward adjustments in certain markets, such as in the heavy production areas of the Midwest, it is difficult to determine from this record what the adjustments should be. This is particularly so when the industry has strongly supported over the years a coordinated set of differentials based on fairly constant rates of change from market to market.

Id. at 12646.

We recognize that the current Class I differential system is imperfect. Its heavy-handed reliance on a marketing area's distance from the Upper Midwest probably justifies characterizing it as a single-basing-point system, as the District Court, the MMPA, and several hearing witnesses did. Even so, it is not so rough an approximation that, under our deferential standard of review, we could find that the Secretary was compelled to undertake amendment. However, as the Secretary himself states, "[t]his is not to say that the Secretary lacks a continuing duty to investigate and respond to changed circumstances *that warrant modification of the existing orders.*" Appellant's Br. at 37 (footnote omitted) (emphasis added). We hold only that the Secretary's conclusion in this case, that circumstances had not changed to that critical extent, was not arbitrary and capricious.

### C. The Sufficiency of the Secretary's Explanations

We also believe that the Secretary sufficiently explained his decision to maintain the existing differential system. Because he did not bear the burden of proof, and because of the resulting deferential standard of review due his inaction, the Secretary's burden of explanation was not heavy.

-26-

In his first decision, the Secretary summarized the 35 proposals for changing the Class I pricing system, and the supporting testimony for each. Secretary's Decision I at 12637 - 12645. He then analyzed the major concerns reflected by those proposals. Id. at 12645 -12652. We agree with the Secretary that "[t]he basic issue is whether a compelling case was made that some other Class I pricing system is needed. After a review of the supply and demand situation in the various markets, it is concluded that no changes are needed. Having concluded that the current Class I pricing system is appropriate and is in accord with the pricing standard in the Act, it is not necessary to then proceed to discuss in detail why each of numerous proposals should not be adopted," id. at 12649, the MMPA's (through the UMFOC) included.

Moreover, at the Court's request, the Secretary provided further explanation of the Class I price, in his amplified decisions of 1994 and 1996. In response to the Court's first remand order, the Secretary explained that the other component of the Class I price, the M-W base price, accounted for many of the local market factors listed in § 608c(18): because it reflects the competitive market price for raw milk, it "automatically reflects the price and availability of supplies of feed and all other economic factors that affect the supply and demand for milk and dairy products." Secretary's Decision II at 42425. He then explained that the Class I differential "is intended to partially reflect the cost of transporting milk . . . [and] serves as an incentive to move milk from supply areas to demand centers." Ibid. He acknowledged that "[b]ecause some milk is produced just about everywhere, the mix of milk produced near consumption centers with milk shipped from distant areas varies among orders," id. at 42426 -- a fact on which the MMPA's argument is built -- but explained that "[a]s the mobility of milk increased, a transition necessarily occurred from considering only isolated local markets to considering a system of regional markets that are linked through class price coordination. Individual markets that previously set class prices based on local supply-demand conditions now are part of larger regional markets whose prices are coordinated through the M-W price . . .." Ibid.

The 1996 amplified decision addressed the further concerns of the Court as to both the differential and base-price components of the Class I price. The Secretary contended with some plausibility that the present differentials are not a single-basing-point system:

> the mere fact that real-world market forces necessarily yielded, over time, an aligned Class I pricing system that correlates to geography simply does not mean that the enormous reserve quantities of milk in the Upper Midwest relative to other marketing areas (east of the Rocky Mountains) constitute a 'single basing point.' The high degree of correlation between distance from the Upper Midwest, and another area's supply-demand relationship is reflective of this reality. It justifies the current Class I differentials, not the other way around.

Id. at 49085. Regarding the Court's question of how the M-W price accounted for local market conditions, the amplified decision explained that the M-W price served the statute's goals by "incorporating the fluctuations in supply and demand, as reflected by free market transactions, into classified pricing. Class I pricing therefore responds to, rather than dictates, supply and demand." Ibid.

## V. THE M-W BASE PRICE

We have before us the further issue of whether the District Court erred in upholding the M-W base price, which was not the subject of the MMPA's suit. We hold that it did not.

The issue of the M-W base price entered the litigation through the Secretary's explanation in his first amplified opinion. In that opinion, responding to the Court's question of how the Class I differential reflected local economic factors, the Secretary answered that those factors were accounted for largely by the M-W base price, not the differential, and proceeded to explain the concept and development of that price. In its

-28-

second remand order, the Court asked specifically for more explanation of the base price, which the Secretary provided in his second amplified opinion. In that opinion, he also indicated that, though the base price had not been addressed at the 1990 rulemaking, there had been a subsequent hearing, in 1992, which had focused on the base price, and he summarized the findings from that hearing. In its final opinion, the Court found that "the Secretary's reference to the second administrative hearing, as discussed in the second amplified decision, deals with the § 608c(18) factors and the M-W price. Accordingly, the Court finds that the Secretary has fulfilled his burden with respect to this aspect of the Class I price of milk." District Court Order at 12 (Nov. 3, 1997).

Because the concerns about the M-W price were integrally related to -- indeed, grew out of -- the MMPA's challenge of the differential, the question of its validity was properly before the Court. It is the total Class I price -- the two price components together -- and not just the differential, that must satisfy the statute. The Secretary explained,

> [T]he M-W price is the key component in the Class I price, representing the many supply and demand factors referenced in § 608c(18). The M-W price does not, however, reflect one factor uniquely relevant to Class I fluid milk pricing: the cost of transporting milk from alternative supply sources. When the Class I differential, which largely reflects transportation costs, is added to the M-W price, the minimum Class I price in each market is set.

Secretary's Decision III at 49086. The question of the lawfulness of the differential could not be resolved without accounting for the effect of the base price.

The MMPA contends that because it had not focused on this aspect of the Class I price during the course of litigation, the Court's understanding of the issue was insufficient to support a holding. However, further litigation would not add to the

existing administrative record of the Secretary's 1992 hearing.  On the basis of that record, we hold that the Secretary's maintenance of the M-W base price was not arbitrary and capricious.  We note that, though the use of the M-W base price was not established by statute, the other factors weighing in favor of deferential review of the Class I differentials also apply to a review of the base price.

The record supports the Secretary's decision to maintain the M-W base price with minor modification.  The hearing encompassed ten proposals, addressing "(1) competitive pay prices, (2) product price formulas, (3) cost-of-production formulas, and (4) the price support level."  Milk in the New England and Other Marketing Areas; Decision on Proposed Amendments to Tentative Marketing Agreements and Orders, Proposed Rule, 60 Fed. Reg. 7290-91 (1995).  The full discussion of these proposals in the Secretary's decision indicates a consideration of relevant factors, after which the Secretary's finding that "the economic rationale stated when the M-W was first adopted remains sound today as it was when it was adopted order-by-order from 1961 until universally adopted in 1975," Secretary's Decision III at 49086, was not clear error. The Secretary's decision thus was not arbitrary and capricious.

## VI.  POST-JUDGMENT MOTIONS

The following movants appeal the Court's denial of their post-judgment motions for intervention:  the National Farmers Organization, the Association of Dairy Cooperatives in the Northeast, the Texas Association of Dairymen, Dairy Producers of New Mexico, Lone Star Milk Producers, Premier Milk Producers, and the

agricultural agencies of various states.[6] The Court denied the motions for intervention because they were untimely. We agree.

The determination of timeliness was committed to the discretion of the District Court. Arkansas Elec. Energy Consumers v. Middle South Energy, Inc., 772 F.2d 401, 403 (8th Cir. 1985) (citation omitted). The Court considered the factors relevant to a determination of timeliness: "how far the litigation had progressed at the time of the motion for intervention, the prospective intervenor's prior knowledge of the pending action, the reason for the delay in seeking intervention, and the likelihood of prejudice to the parties in the action." Arrow v. Gambler's Supply, Inc., 55 F.3d 407, 409 (8th Cir. 1995). It found the movants' proffered reasons -- that they lacked notice of the action and did not realize its potential effects on their interests -- "hard to believe" in light of the publication of the Secretary's amplified decisions and the organizations' presumably heightened awareness of and interest in dairy regulation issues. District Court Order at 15 (Dec. 5, 1997). It noted that the movants had not sought to intervene until the latest opportunity, and that their delayed entry would prejudice the MMPA, who would be forced to respond to the movants' arguments. We believe these findings to be within the Court's discretion.

---

[6]These agencies are: Alabama Department of Agriculture and Industries; Arkansas Department of Agriculture and Livestock/Livestock and Poultry Commission; Colorado Department of Agriculture; Georgia Department of Agriculture; Kentucky Department of Agriculture; Louisiana Department of Agriculture; Maine Department of Agriculture, Food, and Rural Resources; Massachusetts Department of Food and Agriculture; Mississippi Department of Agriculture and Commerce; New Hampshire Department of Agriculture, Markets, and Food; New Mexico Department of Agriculture; North Carolina Department of Agriculture; South Carolina Department of Agriculture; Vermont Department of Agriculture, Food, and Markets; and Washington Department of Agriculture. Rhode Island Department of Environmental Management and West Virginia Department of Agriculture are listed as movants on appeal, but were not part of the initial motion for intervention.

Additionally, the state movants appeal the Court's denial of their motion for relief from judgment under Federal Rule of Civil Procedure 60(b). They claim that Rule 60(b)(4) -- providing relief when the judgment is void -- allows for relief from judgment when indispensable parties who could have been joined were not. We affirm the Court's holding that the state movants were not indispensable parties to this action. Though the determination of the legality of the Secretary's decision would and will affect all organizations whose interests are reached by the Secretary's regulations, "this fact does not make all of those effected [sic] individuals indispensable parties." NAACP v. Donovan, 558 F. Supp. 218, 223 (D.D.C. 1982).

## VII.

We reverse the judgment that the Class I differential system is unlawful and the Secretary's decision arbitrary and capricious. We therefore also reverse the injunction against its operation. We reject MMPA's challenge on cross-appeal to the District Court's holding that the M-W price is lawful. We also affirm the Court's rejection of the post-judgment motions brought by nonparties.

The Secretary may therefore continue to enforce the existing Class I pricing system.

It is so ordered.

LOKEN, Circuit Judge, concurring.

I agree that the district court's injunction must be reversed, but I arrive at this conclusion by a somewhat different path.

In November 1975, the President's Antitrust Immunities Task Force undertook to study the effects of government regulation of the dairy industry. The Task Force's

1977 final report urged reduced Class I differentials and phased deregulation of milk marketing, observing:

> [F]ederal milk orders are a significant deviation from a free-market economy, which deviation creates substantial undesirable economic effects. The system as administered has succeeded to a startling extent in maintaining milk markets as they existed in the 1930s. . . . The goal of an adequate supply for local consumption needs has been achieved; however, the need frequently is inappropriately supplied from local production, to the substantial detriment of consumers and some producers. . . . The order system and cooperative monopolization have cost consumers and society millions of dollars each year in overcharges, deadweight losses, and transfer payments. Some farmers (grade B and Minnesota and Wisconsin grade A) actually lose income to other farmers (all other grade A). It is difficult to imagine that Congress intended this result.

U.S. DEPARTMENT OF JUSTICE, FEDERAL MILK MARKETING ORDERS AND PRICE SUPPORTS 139-41 (Paul W. MacAvoy ed. 1977). Congress nonetheless went in the other direction in 1985, mandating higher Class I differentials for at least two years. By March 1990, industry concerns had prompted the Secretary to announce "a national hearing on milk marketing orders to 'determine whether reasons exist to change current Federal milk orders,'" with particular emphasis on the Class I differentials. Milk in the New England and Other Marketing Areas [etc.], 58 Fed. Reg. 12634, 12635 (1993).

This appeal concerns the final agency action in that proceeding. There is substantial evidence that the existing Class I differentials do not reflect current supply/demand conditions in the various local milk marketing areas.[7] Faced with this

---

[7]For example, a study using computer generated, revenue-neutral differentials based on 1995 data concluded that the differential in Minneapolis was $.77/cwt too low, while differentials for Dallas, Denver, and Phoenix were more than $.60/cwt too high. See PRATT ET AL., ESTIMATION OF REGIONAL DIFFERENCES IN CLASS I MILK VALUES ACROSS U.S. MILK MARKETS 5 (1998). A study based on 1993 data reached similar conclusions. See NOVAKOVIC, CORNELL PROGRAM ON DAIRY MARKETS AND

evidence, the district court was understandably frustrated at the Secretary's continuing inability to justify differentials that he decided to retain at the end of a lengthy proceeding he had initiated. Nonetheless, I conclude the court's decision to declare the Secretary's action arbitrary and capricious and to enjoin its implementation should be reversed because of overriding recent events.

In the Agricultural Market Transition Act of 1996, Congress acknowledged the need for reform and directed the Secretary to amend milk marketing orders, using an expedited informal rulemaking procedure and focusing specifically on the issue of "multiple basing points for the pricing of fluid milk." 7 U.S.C. § 7253(a)(3)(A). Acting pursuant to this new authority, the Secretary promulgated proposed amendments to the marketing orders in January 1998, some two months after the district court issued its injunction. Using a computer simulator designed at Cornell University, the Secretary advanced two options to replace the current Class I differentials, both intended to better correlate regulated milk prices and existing market conditions. See Proposed Amendments to Marketing Agreements and Orders, 63 Fed. Reg. 4802, 4904-15 (1998) (to be codified at 7 C.F.R. pts. 1000 *et seq*.). The second option, which the Secretary describes as "preferred," will "move the dairy industry into a more market-determined pricing system" and "reduce[] the government presence in establishing minimum Class I prices" by setting prices according to a mathematical estimate of transportation costs and by giving "dairy farmers and processors more freedom to negotiate fluid milk price levels." Id. at 4913-15. In other words, the Secretary now has in progress, with the express endorsement of Congress, a new administrative proceeding explicitly addressing the deficiencies the district court has identified in existing milk marketing orders. The Secretary is required to complete this

POLICY BRIEFING PAPER NO. 22: TESTIMONY ON FEDERAL MILK MARKETING ORDER POLICY 5-6 (1995).

proceeding and to implement amended marketing orders by April 4, 1999. <u>See</u> 7 U.S.C. § 7253(b)(2)(B).

Milk marketing orders are the product of complex legislation and are administered by an agency of the executive branch chosen by Congress and subject to congressional oversight and control. As the court has explained, the judiciary has a meaningful but limited role in reviewing whether the agency has acted consistently with its legislative mandate. Regulatory reform is a difficult, time consuming task best conducted by Congress and the Executive, the branches of government directly responsible to the electorate. In the midst of a long, politically sensitive debate over how to reform an antiquated regulatory regime, Congress has now intervened in decisive fashion, and the Secretary has begun implementing this new mandate. It is time for the judiciary to stay its hand. Accordingly, while I have substantial sympathy for the Minnesota Milk Producers Association's position and the district court's response to the issues it was presented, I concur.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.