**ST. ALBANS COOPERATIVE CREAMERY, INC., et al., Plaintiffs**

v.

**Dan GLICKMAN, Secretary of Agriculture, Defendant.**

**No. 99 CV 274.**

United States District Court, D. Vermont.

Sept. 28, 1999.

also the $55 million in actual compensation    from the United States Government.

Karen McAndrew, Dinse, Knapp & McAndrew, P.C., Burlington, VT, Marvin Beshore, Milspaw & Beshore, Harrisburg, PA, for St. Albans Cooperative Creamery, Inc., Agri–Mark, Inc., Ralph McNall, Thomas Magnant, David Montagne, James Fay, George Kempton, Paul Percy, Dairyland Cooperative, Inc., Upstate Farms Cooperative, Inc., plaintiffs.

Paul J. Van de Graaf, Office of the United States Attorney, District of Vermont, Burlington, VT, Daniel Bensing, U.S. Department of Justice, Federal Programs Branch of Civil Division, Washington, DC, for Dan Glickman, Secretary United States Department of Agriculture, defendants.

Carolyn F. Corwin, Covington & Burling, Washington, DC, Geoffrey W. Craw-

ford, O'Neill, Crawford & Green, Burlington, VT, for International Dairy Foods Ass'n (IDFA).

Scot L. Kline, Miller, Eggleston & Cramer, Ltd., Burlington, VT, Harry R. Silver, Wendy M. Yoviene, Ober, Kaler, Grimes & Shriver, Washington, DC, John Vetne, Newburyport, MA, for State of Minnesota, State of Wisconsin.

## OPINION & ORDER

SESSIONS, District Judge.

Plaintiffs are dairy farmers and associations of dairy producers who seek to enjoin implementation and enforcement of the Secretary of Agriculture's Final Rule and Order amending federal milk market orders published September 1, 1999 at 64 Fed.Reg. 47898–48021. Plaintiffs argue that the Final Order violates: (1) the Federal Agriculture Improvement and Reform Act of 1996, 7 U.S.C. § 7253 (the "FAIR Act") by in effect mandating less than ten separate milk marketing orders; (2) the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq. (the "AMAA") by failing to take into account the price and supply of feeds as well as other economic conditions which affect the market supply and demand for milk; and (3) the Administrative Procedures Act, 5 U.S.C. 706(e) (the "APA") by modifying the existing milk marketing orders in an arbitrary and capricious way or otherwise not in accordance with the law. The Court conducted a hearing on Plaintiffs' Motion for Temporary Restraining Order on September 22, 1999. Based upon arguments of counsel at the hearing together with written submissions by all parties and the record to date, the Court hereby GRANTS Plaintiffs' Motion for a Temporary Restraining Order.

## I. *Background*

For most of this century, the United States Department of Agriculture (USDA) has been authorized to regulate the marketing of raw milk by dairy farmers pursuant to the Agricultural Marketing Agreement Act of 1937. The AMAA regulations, referred to as "orders," are intended to promote stable, orderly marketing conditions among dairy farmers ("producers") and milk buyers ("handlers") in local and regional marketing areas. *See, generally, Zuber v. Allen,* 396 U.S. 168, 171–180, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (explaining history and application of AMAA).

To promote market stability envisioned by the AMAA, minimum prices are established for milk and a "pool" of milk value shared equally by all farmers supplying the market. The pooling mechanism allows all farmers to receive a uniform minimum price ("blend price") regardless of the specific buyer or use to which each farmer's milk is put. The handlers pay a uniform minimum price on the basis of the use of their milk. Milk used for drinking (fluid or Class I) receives the highest price and soft or hard dairy products command lower prices. Through the pool mechanism, a market administrator collects payments from handlers based on the handler's use of milk and distributes payments to producers on the basis of the average value for the entire market.

Under the existing order structure, milk is classified as Class I if it is used as fluid milk, such as beverage milk; as Class II if it is used as a "soft" dairy products, such as yogurt, ice cream and cottage cheese; Class II if it is used for "hard" manufactured dairy products, such as cheese and butter; and Class III–A if used for nonfat dry milk. *See,* "Milk in the New England and Other Marketing Areas; Decision on Proposed Amendments to Tentative Marketing Agreements and Orders," 58 Fed. Reg. 12634, 12635 (Mar. 5, 1993).

Prior to the Secretary of Agriculture's Final Decision and Order published September 1, 1999, 64 Fed.Reg. 47898–48021, which consolidates and amends federal milk pricing regulations, producers such as those bringing this action received minimum prices for milk set within marketing areas under the AMAA. This statutory

system of marketing areas mandates regional regulations which are tailored to the particular marketing conditions of the market area. Milk order marketing areas have been established by the Secretary pursuant to the AMAA and have contained several characteristics crucial to assisting the farm economies of the areas covered by the market orders. Market order specific prices have been established in each of the marketing areas based on local economic conditions. Local hearing procedures have been available to make adjustments to regulated prices at the local level where pricing anomalies occur under a marketing order. The AMAA statutory system mandates local regulations tailored to particular marketing conditions. 7 U.S.C. § 608c(11). The AMAA directs the Secretary to "give due recognition to the differences in production and marketing" of milk in each marketing area. 7 U.S.C. § 608c(11)(C). Specifically, the Secretary of Agriculture is directed, under the AMAA, to establish prices to "reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates." 7 U.S.C. § 608c(18).

The process of regulating and pricing milk in the United States is extremely complex. As one court held, "the milk program is exquisitely complicated.... The milk problem is so vast that to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative process of government." *Brannan v. Stark,* 185 F.2d 871, 876 (D.C.Cir.1950). Generally, milk prices include a base or mover price together with a differential. The mover price is set on a monthly basis from Class III milk by purchasers in Minnesota and Wisconsin, popularly known as the "M–W price." Differentials are used to establish Class I and II prices based upon such economic considerations

as distance between the geographical areas covered by each marketing order and the cost of transferring milk from surplus areas to deficit areas. The blend price paid to farmers is calculated based upon the pooling of all milk products within a geographical order or area. *See, e.g., Minnesota Milk Producers Ass'n v. Glickman,* 153 F.3d 632, 637 (8th Cir.1998) (explaining minimum price calculation for milk classifications).

Producer groups in the upper Midwest have opposed the current milk marketing system. They contend that the current milk marketing system encourages milk production in high cost of production regions such as the Southeast, Texas and the Northeast at the expense of the upper Midwest. The producers argue that by reducing the differentials paid to these high cost of production regions, the amount of milk produced in those regions would be decreased and their prices correspondingly increased.

In 1996, Congress enacted the Federal Agricultural Improvement and Reform Act (the "FAIR Act") which directed the Secretary of Agriculture to review the milk marketing order system and reduce the number of orders from 31 to "not less than 10 and not more than 14 orders." 7 U.S.C. § 7253(a)(1). The FAIR Act directed the Secretary to consolidate orders, and Congress authorized the Secretary to review the pricing structures, permitting the Secretary to consider the use of utilization rates, multiple basing points, and uniform component pricing. 7 U.S.C. § 7253(a)(3). The FAIR Act also authorized the Secretary to use informal rule making procedures under Section 553 of the APA. Congress noted the likelihood of judicial review regarding the orders and expressly extended the implementation period to allow for such review:

> In the event the Secretary is enjoined or otherwise restrained by a court order from publishing or implementing the consolidation and related reforms under

subsection (a) of this section, the length of time for which that injunction or other restraining order is effective shall be added to the time limitation specified in paragraph (2) thereby extending those time limitations by a period of time equal to the period of time for which the injunction or other restraining order is effective.

7 U.S.C. § 7253(b)(3).

The Department of Agriculture published a proposed rule on January 21, 1998 in the Federal Register reducing the 31 Federal milk orders into 11 orders. The rule also proposed two options (IA and IB) to replace the price structure of the Federal milk order system. 63 Fed.Reg. 4802 (1999). Both options were based on the United States Dairy Section Simulator (USDSS) developed at Cornell University. Generally, Option IA approximates the existing system. Option IB relies upon market forces. It established a uniform national base price and applies differentials according to the regional order. According to Plaintiffs, Option 1B would result in substantial reductions in price differentials to many areas of the country, including the Northeast.

The Secretary asked for comments on the proposed options from dairy farmers from across the country. Well over 80% of the responding farmers favored Option IA. Despite such strong support from farmers for Option IA, the Secretary adopted Option IB in his final decision on April 2, 1999. 64 Fed.Reg. 16025.

Pursuant to Section 608c(19) of the AMAA, a milk marketing order can take effect only if, after the promulgation of a rule by the Secretary, a two-thirds majority of the dairy producers involved adopt a referendum in favor of the proposed order. The Secretary provided notice of the referendum on July 21, 1999. Rather than including both options in the referenda, the Secretary chose to give the producers only two choices: either adopt Option IB or face a system of no market orders. Since the removal of all milk marketing orders would have a devastating impact upon the dairy industry, over 90% voted for Option IB.

The Secretary has suggested in his brief that Option IB has the almost universal support of farmers as evidenced by the vote on the referendum. The Court considers that assertion to be a distortion of the record at best and a misrepresentation at worst. The AMAA gave producers the right to pass upon proposed changes in the milk marketing system. The Secretary's decision to limit the choices to a pricing system most farmers opposed or no milk marketing orders at all violates the spirit if not the letter of the AMAA.

## II. Standards for Temporary Restraining Order

The trial court is vested with wide discretion in deciding whether to grant a temporary restraining order. *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir.1994). To be eligible for a temporary restraining order, the plaintiff must demonstrate that it will suffer irreparable harm and that there is either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of hardships tipping decidedly in the movant's favor. *Brenntag International Chemicals v. Bank of India*, 175 F.3d 245 (2d Cir.1999).

When the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, injunction should be granted only if the moving party meets the more rigorous likelihood of success standard. *Beal v. Stern*, 184 F.3d 117 (2d Cir.1999). Furthermore, the movant is required to meet the higher "clear" or "substantial" likelihood standard where: "(I) an injunction will alter, rather than maintain, the status quo, or (II) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at

a trial on the merits." *Tom Doherty Associates v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). "Though the 'clear showing' qualifier appears to have been abandoned for injunctions that serve the traditional purpose of preserving the status quo, plaintiffs have been put to a more rigorous burden in obtaining preliminary injunctions that order some form of mandatory relief. [... A] 'clear showing' is required where the injunction is mandatory." *Securities And Exchange Commission v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir.1990) (internal citations omitted). *See also Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 at 441 (recognizing higher standard for mandatory injunction).

As the movant here seeks to enjoin governmental action pursuant to a statutory or regulatory scheme, the likelihood of success standard applies. In determining whether "clear" or "substantial" likelihood is also required by *Saban*, the Court must evaluate whether the status quo is being addressed. At present, milk pricing is operating under the old system. Therefore, Plaintiffs seek to preserve the status quo. Furthermore, this temporary restraining order does not require a positive act on the part of the defendants as is the case with mandatory injunctions. For the foregoing reasons, *Saban*'s "clear" or "substantial" likelihood of success standard does not apply. However, even if *Saban*'s heightened standard did apply based on the limited filings to date, Plaintiffs' claim that the Secretary violated the mandates of the AMAA shows a clear and substantial likelihood of success.

Because the Secretary did analyze various factors before implementing the modified 1B plan, it should not be set aside lightly. This Court has previously recognized its duty to tread lightly when litigation involves the creation and implementation of complex governmental programs. *See Vermont Assembly of Home Health Agencies v. Shalala*, 18 F.Supp.2d 355 (D.Vt.1998) ("*VNA*"). Therefore, this Court's review of the Secretary's decision is limited to whether the decision is in accordance with the law and is supported by substantial evidence. *See Suntex Dairy v. Block*, 666 F.2d 158, 162 (5th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982); *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 315 (3d Cir.1968), *cert. denied sub nom. Lewes Dairy, Inc. v. Hardin*, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969). In the present case, the issue before the court is whether the Secretary's decision was made in accordance with the law.

### III. Discussion

**A. Immediate and Irreparable Harm and Other Adequate Remedies at Law.**

"The premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole." *American Hosp. Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 594 (7th Cir.1986). Plaintiffs argue that even if they eventually prevail on the merits, they and other Northeast producers will lose substantial amounts of income in the immediate future and suffer irreparable harm if this Court does not issue a temporary restraining order.

Economic analysis of the Secretary's final order shows that dairy farmers across the nation stand to lose $272 to $404 million dollars annually under the new milk pricing system. In the Northeast alone, farmers will lose $84 to $118 million annually. Declaration of Robert D. Wellington at 2.

Additional studies show that under all Federal Orders in the year 2000, total annual farm income will fall by $582.9 million dollars as a result of the proposed change in the milk pricing structure. *Id.* at 3. By lowering farm income in the Northeast by $.71 per hundredweight, an annual loss of $203.5 million dollars will ensue. *Id.* The $.71 per hundredweight income decline will reduce the average farm income by $10,650 in the New England Order, $9,580 in the Middle Atlantic

Order, and $8,520 in the New York—New Jersey Order. Net farm income across the nation will be reduced by twenty-five percent under the new order. *Id.*

The devastating financial impact upon the family farms of the Northeast also appears to be immediate. As a result of a minimum 20% reduction in Class II milk prices ($2.64 or more per hundredweight), the Northeast Order will lose $8.8 million in the month of October for Class I and II milk. Nationally, the anticipated October loss to farmers is $37.7 million. The impact on northeastern farmers is substantial; each farm can expect to lose approximately $500 in October alone. That $500 loss goes right to the bottom line of farm families and may cause many farms to disband.

Defendants do little to rebut these studies. They merely, claim that the actual price of Class I milk will not decline, and only the differentials will decline. Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order at 19. The Secretary further states that any projections beyond the month of October are largely conjectural, but again offers no studies to rebut those submitted by the Plaintiffs.

The Class I price is a base price that is the same for each order, while the differentials vary from order to order and ensure that the costs and benefits of the milk market are proportionately shared by all dairy farmers. Although the "base prices" may technically rise, it has little or no effect on the actual price per hundredweight paid to farmers in this action. Therefore, the rise in base prices fails to protect against lost farm income. Rather, it is the very change in differentials which will have the negative impact on the Plaintiffs.

As the Secretary's counsel indicated at the hearing, this is a "zero sum game" between handlers and producers. At the most basic level, then, implementation of the Secretary's final order will mean immediate gains for handlers and losses for

farmers. Plaintiffs further argue that once the new pricing system is implemented they will be unable to recover this lost revenue. Defendants do not dispute the farmer's inability to recoup these losses. Since there is no alternative remedy at law for recovery of these losses which will occur during the pendency of this matter before the Court, the Plaintiffs will suffer irreparable, immediate injury in the absence of a temporary restraining order.

**B. Likelihood of Success**

Plaintiffs contend that they are likely to succeed on the merits of three separate claims. First, they claim that the Secretary violated the FAIR Act by effectively decreasing the number of milk marketing orders to less than ten. Second, they assert that the Secretary violated the AMAA by failing to take into consideration regional feed costs and other economic factors in the creation of the new marketing orders, which will have a direct, immediate impact on the minimum prices of milk. Third, Plaintiffs argue that the Secretary violated the APA by using a "computer model" in creating the final order, and that this was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Based upon the submissions to date, the Court finds that there is a likelihood of success on the Plaintiffs' claim raised under the AMAA. Thus, it need not address the other two claims.

*(1) Standing*

Defendants claim that Plaintiffs, as dairy producers, lack standing to challenge milk marketing orders under the AMAA. Section 608c(15) of the AMAA provides a cause of action for milk handlers after they have exhausted administrative remedies. It makes no mention of such suits, or limitations on such suits, by handlers. Defendants rely on *Pescosolido v. Block,* 765 F.2d 827 (9th Cir.1985) for the proposition that the lack of similar language regarding producers suits evinces Congressional intent to bar producer challenges to changes in milk marketing orders.

In *Pescosolido*, the Ninth Circuit interprets the Supreme Court's holding in *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)("*CNI*") to "foreclose judicial review sought by anyone other than handlers." *Id.* at 831. The Sixth and Eighth Circuits, however, interpreted *CNI* to support the opposite conclusion. *See Farmers Union Milk Marketing Cooperative v. Yeutter*, 930 F.2d 466 (6th Cir.1991) ("*Farmers Union*"); *See also Minnesota Milk Producers Association v. Madigan*, 956 F.2d 816 (8th Cir.1992).

With all due respect to the *Pescosolido* Court, this Court finds the Sixth and Eighth Circuit opinions of *CNI* to be better tailored to the language and history of the AMAA. In *CNI*, the Supreme Court concluded that "ultimate consumers" were precluded from suing the Secretary of Agriculture under the AMAA. The Court, however, did not address the viability of producer suits. It noted that the "statutory scheme [ . . . ] makes [ . . . ] clear [ . . . ] Congress' intention to limit the classes entitled to participate in the development of market orders. The Act contemplates a cooperative venture among the Secretary, handlers, and producers, the principal purposes of which are to raise the price of agricultural products and establish an orderly system for marketing them. Handlers and producers—but not consumers—are entitled to participate in the adoption and retention of market orders." *Id.* at 346, 104 S.Ct. 2450. AMAA language, the Court found, "indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* at 347, 104 S.Ct. 2450. The *CNI* Court further emphasized that the purpose of the AMAA was to protect the producers of milk, but not the general public. *Id.* at 352, 104 S.Ct. 2450.

In *Minnesota Milk Producers Association v. Madigan*, 956 F.2d 816 (8th Cir. 1992), Minnesota milk producers claimed that if the Secretary of Agriculture had adequately considered § 608c(18) factors, he would have lowered minium milk prices. The standing question was identical to the one in the present case—whether the language of the AMAA which allows for limited review by handlers precludes milk producer suits. In finding that it does not, the Court relied on the notion of milk producers' "definite personal right" in challenges to minimum milk prices. *Id.* at 818. Here the Eighth Circuit embraced *CNI*'s rearticulation of its holding in *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944). There, the Supreme Court held that producers were not barred from bringing suits regarding the AMAA settlement fund. In *CNI*, the Supreme Court denied consumer standing, distinguishing consumer suits from the producer suit allowed by *Stark*. Under *Stark*, producers were found to have " 'definitive personal rights' that were 'not possessed by the people generally' which 'gave [them] standing to object to the administration of the settlement fund.' " *Minnesota Milk Producers Association v. Madigan* at 818, (quoting *CNI* at 351, 104 S.Ct. 2450, quoting *Stark* ). The Eighth Circuit also found compelling the Supreme Courts' choice to emphasize "that one of the Act's fundamental objectives is to protect the producers of milk, not the general public." *Id.*, citing *CNI* at 352.

The Sixth Circuit came to the same conclusion in *Farmers Union*. There, the Court found that "the legislative purpose of increasing producers' prices would be furthered by allowing them to challenge actions that they believe reduce those prices illegitimately. [ . . . ] [T]he purpose of the scheme would be undermined if producers were wholly unable to challenge these changes." *Id.* at 474. The Court concluded that no inference of legislative intent to preclude producer suits could be drawn from legislative silence on administrative remedies for producers. The Court further found the *Pescosolido* Court's denial of producer standing to be "a radical reading of *CNI* [which would]

restrict judicial review to those parties provided with administrative remedies in an overwhelming number of cases [. . . and . . .] effectively undermine the presumption in favor of judicial review that the Supreme Court has consistently reaffirmed. *See, e.g. Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)." *Id.* at 473–74 (internal string cites omitted).

Defendants' reliance on the logic of the maxim expressio unius est exclusio alterius is flawed in yet another regard. Although the statute specifically references handler suits and not producer suits, the language places limitations on handlers, requiring exhaustion of administrative remedies prior to filing in federal court. The omission of such language regarding producer suits could be read to signify a lack of similar limitations on producers; if "[t]he 'essential purpose [of this milk market order scheme is] to raise producer prices,'" *CNI* at 342, 104 S.Ct. 2450, (citing S.Rep. No. 1011, 74th Cong., 1st Sess., 3 (1935)), then placing limitations on those who seek to deflate prices but not on those who seek to raise them provides the most reasonable interpretation of the AMAA. As the Sixth Circuit found in *Farmers' Union,* "the purpose of the AMAA is wealth redistribution in favor of milk producers. Placing milk producers in a favored position is surely consistent with this legislative purpose." *Id.* at 474. For the forgoing reasons, Plaintiffs having standing to challenge the Secretary's actions under the AMAA.

(2) *Plaintiffs are Likely to Show that the Price of Feeds and Other Regional Economic Factors Were Not Adequately Considered, in Violation of 7 U.S.C. § 608c(18).*

◼ The AMAA requires that the establishment of milk prices cannot be made without consideration of "the price of feeds, the available supplies of feeds, and other economic conditions which effect

market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order or amendment relates." 7 U.S.C. § 608c(18). The Sixth Circuit clarified this requirement in *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339 (6th Cir.1994):

> The proposed amendment [Section 608c(18)] recognizes [. . .] that if the Secretary finds the national parity price for milk does not adequately reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the marketing area to which the marketing agreement order relates he shall fix such prices as will reflect such factors, insure sufficient quantity of pure wholesome milk, and be in the public interest.

*Id.* at 1351–52, quoting H.R.Rep. No. 468, 75th Cong., 1st Sess.1937. Plaintiffs contend that the Secretary's final order is wholly lacking in consideration of the prices of feed, supplies of feed, or other economic conditions affecting supply and demand for milk in the northeastern marketing region. Thus, implementation of the order would violate federal law.

Defendants' first response reflects the apparent ambivalence with which the Secretary approached consideration of regional economic conditions in setting price supports. They claim that the Secretary was not required to consider the local feed price fluctuation, because the act of limiting the order areas from thirty-three to eleven was governed by the FAIR Act, not the AMAA. Defendants argue that the FAIR Act supplied the Secretary with a one-time duty to consolidate marketing orders by changing both the nature of the procedures involved and the scope of the issues to be considered.

Defendants also argue that the FAIR Act's requirement of informal rather than the formal rulemaking used in AMAA hearings, evinces Congressional permission to abandon the confines of AMAA's § 608c(18) requirements. It is unpersua-

sive that the FAIR Act, with its manifold references to the AMAA, undermines sixty years of milk marketing regulation merely by omission. The Secretary himself acknowledged his responsibility to comply with the dictates of the AMAA in his final decision under the FAIR Act: "A Class I price structure must meet the requirements of the AMAA. [...] [T]he pricing criteria of the AMAA, § 608c(18) requires prices that are reflective of the economic conditions affecting the supply and demand for milk." 64 Fed.Reg. at 16109.

The language of the FAIR Act does nothing to limit the dictates of the AMAA. Although Congress stated that "[t]here is no limitation on the number of issues the Secretary may consider when consolidating orders," H. Conf. Rep. 494, 104th Cong., 2d Sess. At 337 (1996), this language merely encourages the Secretary to consider a wide variety of issues in his decision making process. It makes no mention of decreasing the number of issues he may consider, or alleviating his responsibility to consider regional feed costs when milk prices are altered.

Furthermore, Defendants conflate the factors the Secretary is suggested to consider when consolidating the marketing orders under the FAIR Act and the considerations required for reducing minimum milk prices under the AMAA. Changes in milk prices require consideration of regional differences in economic factors such as feed and transportation costs, regardless of whether or not such considerations are required for consolidation under the FAIR Act. Given that the consolidation of the marketing orders has a direct effect on milk prices, the AMAA requirements of regionalized economic considerations still remains in effect. *See Declaration of Robert D. Wellington* at 2–3.

Yet, while Defendants maintain that the Secretary was under no obligation to adhere to AMAA requirements in this matter, they then suggest that AMAA requirements were met through the indirect consideration of regional feed costs. The Secretary described this indirect valuation in the final order: "As feed costs increase with a resulting decline in production, commodity prices would increase as a result of manufacturers attempting to secure enough milk to meet their needs. Such increases in commodity prices would mean higher prices for milk. The opposite would be true if feed costs were declining." 64 Fed.Reg. at 16095–96.

Defendants' rely on an Eighth Circuit case, which found that the indirect consideration of § 608c(18) factors was sufficient in meeting the requirements of the AMAA. *Minnesota Milk Producers Association v. Glickman,* 153 F.3d 632, (8th Cir.1998), cert. denied, —— U.S. ——, 119 S.Ct. 1803, 143 L.Ed.2d 1008 (1999). In *Minnesota Milk Producers Association v. Glickman,* Milk producers sued the Secretary for his failure to create reduced milk price schedules. Plaintiffs claimed that the Secretary was under the duty to regularly consider the § 608c(18) factors and update the minimum milk price accordingly. Asserting that agency inaction is presumptively unreviewable, the Eighth Circuit found that Secretary was under no affirmative duty to act in this case, and the timing of the modification the minimum price was discretionary. Therefore, consideration of § 608c(18) factors was only required when the Secretary modified the minimum prices.

The question of the validity of indirect consideration of the § 608c(18) factors, therefore, was not at issue directly in *Minnesota Milk Producers Association v. Glickman.* Nonetheless, the District Court below addressed this issue and the Court found that there was sufficient evidence on the record to support an adequate consideration of the § 608c(18) factors. However, the Court did not address its reasoning behind the assertion that indirect consideration comports with the AMAA requirement that the Secretary of Agriculture fix prices which are "adjusted to reflect the price of feeds, the available supplies of feeds, and other economic con-

ditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates" § 608c(18). Rather, it simply finds that the Secretary thoroughly explained that these factors were taken into consideration indirectly. *Minnesota Milk Producers Association v. Glickman* at 645. As this discussion lacks in guidance on the issue of the sufficiency of indirect consideration of § 608c(18) factors, this Court looks to the direct language of the statute to determine the sufficiency of the Secretary's consideration, which makes no mention of indirect consideration being adequate in meeting the requirements of § 608c(18).

The record shows no direct consideration of regional costs in feed, feed availability, or other region specific economic factors. Defendant's counsel conceded in oral argument that the only consideration of such factors prior to the announcement of the final order was indirect. Record at 44–47. Had such indirect consideration been sufficient, Congress would not have gone to such lengths in drafting § 608c(18)'s explicit requirements that feed costs and other regional economic considerations be accounted for in the setting of milk prices. Given that the consolidation of the orders creates a concrete and direct effect on milk prices, and that indirect consideration of regional economic factors is imprecise, direct consideration of these factors is required by the AMAA. Since the Secretary failed to adequately consider such factors, the final order violates the AMAA.

C. Balance of Hardships

The Secretary's final order and decision was published on September 1, 1999; the price announcement for milk deliveries beginning October 1 was made on September 17. Class I handlers and their customers planned the pricing of milk sales transactions for October in reliance on this announcement. Defendant–Intervenors Supplemental Memorandum in Opposition to Injunction at 8. Defendants claim that a restraining order at this juncture will cause them economic losses which outweigh plaintiff's losses under the new price announcement.

Defendant–Intervenors are suppliers of milk to large, economically powerful retailers such as Wal–Mart. Wal–Mart, for example, required firm price quotes by September 20, 1999. Given that the Defendant–Intervenors are bound by the prices they offered Wal–Mart and other such purchasers on September 20, they will lose significant amounts of money if the new pricing system does not take effect.

Defendants argue that there was not enough time between the September 17 announcement and September 20 for milk processors to negotiate contingent pricing which accounted for potential price uncertainties. However, Defendant–Intervenors were on notice about the potential for reversion to the old pricing scheme when the rule was first announced. It is inconceivable that the Defendant–Intervenors did not anticipate the current lawsuits and the distinct possibility of the final order and decision being enjoined, especially since Congress specifically addressed such an event in the FAIR Act.

Even more persuasive is Plaintiffs' contention that the Defendants' decision to make plans based on the new order was risky behavior at best, given the language of the Announcement of Advanced Class Prices for the Northeast Order. Again, the industry was duly warned that "should Congressional action or legal challenge delay the implementation of the consolidation and reform of the Federal milk order program as required by the 1996 Farm Bill, then the Class I & II prices in the first sentence of this footnote [the old pricing system] would be applicable." *Announcement.*

If Plaintiffs receive the protection of a temporary restraining order in this case, the Defendants will suffer financial harm.

The Defendant–Intervenors, however, could have mitigated these losses by heeding the warning in the Market Administrator's announcement. Losses due to actions taken in reliance on the new marketing order should have been anticipated based on the language of the price announcement and the likelihood of litigation over this major change in milk prices.

Although one of the primary objective of the AMAA is the protection for dairy farmers, the minimum prices under the new regulations will force many dairy farmers to consider abandoning their business due to the economic hardships these regulations will cause. With the prospect of losing over $10,000 in annual income, and the immediate loss of at least $500 in October alone, the potential for the loss of several family farms in the Northeast and throughout the nation is substantial. Thus, the potential lost income to dairy farmers under the new system, in conjunction with the Defendant's failure to mitigate their own foreseeable potential losses, tips the balance of the hardships in favor of granting the temporary restraining order.

D. Impact on Other Dairy Industry Participants and the Public Interest

Finally, in deciding whether a temporary restraining order is the best course of action, the Court must consider how the order will effect the public interest. *Goshen Road Envtl. Action v. United States Dep't of Agric.*, 891 F.Supp. 1126, 1132 (E.D.N.C.1995); *Merrill Lynch., Pierce, Fenner & Smith v. Bishop*, 839 F.Supp. 68, 73 (D.Me.1993); *Heather K. v. Mallard*, 887 F.Supp. 1249, 1266 (N.D.Iowa 1995). Defendants argue that both the public at large and other dairy industry participants will benefit through the immediate implementation of the new system. They further state that the "majority of producers in each region has determined that their interests would be furthered by the proposed orders and voted to adopt them. This is strong evidence that [...] most producers [...] have concluded that

they will benefit [under the new orders]." *Defendant's Memorandum of Points And Authorities in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction* at 20–21 (No. 1:99–cv–274).

The Secretary's argument here is disingenuous at best. Although farmers nationwide voted to implement this new program, they clearly had no viable option but to vote this way. During the notice and comment period, over eighty percent of the comments received by the Secretary showed a preference for keeping the system intact (1A). The Secretary's final vote, however, did not include an option to retain the status quo. Rather, farmers were forced to choose between a slightly modified 1B and the prospect of no price supports at all. Thus, the court cannot attribute the development of the new marketing system via this Hobson's choice to democratic process.

The Secretary also briefly argues that the public will benefit under the new system through reduced prices in milk. Although reduced rates would bring about immediate public benefit, there is certainly no benefit from the loss of family farms. Furthermore, there has been no argument made that the current prices of milk are prohibitive for American families. Thus, maintaining the status quo will do no disservice to the public good. Rather, preventing the losses to farmers weighs in favor of granting the temporary restraining order.

The aggregate reduction of dairy farmer income, in excess of $60 million, will also harm the states' rural economies. A commonly used multiplier for agriculture ranges from 3 to 5. This means that every dollar earned by dairy farmers gets turned over in the economy 3 to 5 times. This $60 million reduction in revenue to dairy farmers will reduce the states' economic activity by $180 to $300 million or more—further stressing rural economies that

struggle to keep up with the economic expansion that is enjoyed by the suburban areas. *See Declaration of Edward W. Gallagher* at 3.

The Court finds that the public interest would be best served by maintaining the status quo for a more thorough review of the issue.

## IV. *CONCLUSION*

This Court is extremely reluctant to interfere in administrative decisions of members of the Executive Branch of Government concerning complex issues within their field of expertise. Such decisions are generally political ones, and should not be the subject of judicial scrutiny. Rather, the role of the courts is most appropriate when such decisions violate the clear mandate of Congress. Based upon the limited submissions to date, the Court finds the Secretary's Final Order and Decision violates Congress' mandate under the AMAA.

For the reasons stated above, the Court finds that Plaintiffs would suffer immediate and irreparable injury from implementation of the Secretary's Final Decision and Order on October 1, 1999. The Court finds that Plaintiffs have a likelihood of success in their claim that the Secretary's Final Order and Decision violates the AMAA by failing adequately to consider economic factors regarding the marketing of milk in the regional orders across the country. The Court also finds that the balance of hardships weighs heavily in favor of the Plaintiffs.

## V. *ORDER*

The Secretary of Agriculture is hereby enjoined from implementing his final Decision and Order on October 1, 1999, until further order of the Court. The Court will enter an abbreviated scheduling order on September 29, 1999, so that a hearing on Plaintiffs' Motion for a Preliminary Injunc-

tion will be held within thirty days of today's date.