48

**STEW LEONARD'S, Petitioner,**

v.

**Daniel GLICKMAN, United States Secretary of Agriculture, Respondent.**

**No. 3:00CV627 (TPS).**

United States District Court, D. Connecticut.

March 21, 2001.

James A. Wade, Jeffrey M. Thomen, Robinson & Cole, Hartford, CT, for petitioner.

Regina A. Long, U.S. Attorney's Office, Hartford, CT, for respondent.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SMITH, United States Magistrate Judge.

### I. INTRODUCTION

Pending before the court [1] are the parties' cross motions for summary judgment (**docs. 17 & 18**). Petitioner, Stew Leonard's Dairy

---

1. The parties consented to jurisdiction by a United States Magistrate Judge, and this case was transferred to the undersigned pursuant to 28 U.S.C. § 636(c)(1) (**docket no. 15**).

("Stew Leonard's"), brings this action pursuant to the judicial review provision of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 608c(15)(B), against respondent, Dan Glickman, United States Secretary of Agriculture, seeking reversal of the Secretary's March 16, 2000 decision to deny Stew Leonard's "producer-handler" status under Federal Milk Order No. 1, 7 C.F.R. § 1001 *et seq.* (1999). Petitioner claims that the Secretary's decision is "not in accordance with the law," 7 U.S.C. § 608c(15)(B), because the Secretary's decision was arbitrary and capricious. For the reasons set forth below, the Secretary's decision is **AFFIRMED**, petitioner's motion for summary judgment is **DENIED**, and defendant's motion for summary judgment is **GRANTED**.

## II. *DISCUSSION*

### A. FACTS AND PROCEDURAL BACKGROUND

The facts giving rise to this petition are not in dispute, and are set forth in the administrative record filed with the court in this matter.

In order to view the facts in the proper context, an explanation of the underlying regulatory scheme is essential. In the United States, the milk industry is beleaguered by two unique characteristics. One characteristic is the existence of "a basic two-price structure that permits a higher return for the same product, depending on its ultimate use." *Zuber v. Allen,* 396 U.S. 168, 172, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). Milk, regardless of whether it is produced for consumer drinking or product manufacture, is produced in the same manner. The difference lies in the price the end product can fetch in the consumer market; a handler [2] can sell fluid milk at a higher price, thereby allowing the producer to charge the handler a premium for milk destined for drinking. This premium fosters intense competition amongst the producers to sell their milk at the premium price.

The other unique characteristic is "that production yield varies seasonally, resulting in oversupply in the summer months." *Minnesota Milk Producers Ass'n v. Glickman,* 153 F.3d 632, 638 (8th Cir.1998). Because the consumer demand for milk remains relatively constant throughout the year, and the animals' production fluctuates with the animals' nutrition supply during the year, producers must maintain a herd of animals that is able to meet the peak demand in the lean months. The effect of maintaining a herd that can meet the consumer demand in the winter months leaves the producers with a surplus of highly perishable milk in the summer, when the animals are the most productive. Historically, this glut allowed handlers to demand bargain prices because they could obtain their milk from an increased variety of sources because all the producers, both far and near, had a surplus they were anxious to dispose of.

After the milk market, as well as the market for other commodities, self-destructed under the strain of these two forces during the Great Depression, Congress stepped in and enacted the Agricultural Marketing Agreement Act of 1937 ("AMAA"), *codified at* 7 U.S.C. § 601 *et seq.* The purpose of the legislation was "to remove ruinous and self-defeating competition among the producers and permit all farmers to share the benefits of fluid milk profits according to the value of goods produced and services rendered." *Zuber,* 396 U.S. at 180–81, 90 S.Ct. 314. In order to effectuate this purpose, the legislation was intended to "raise producer prices and to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers." *Minnesota Milk Producers Ass'n,* 153 F.3d at 637.

Specifically, the AMAA gives the Secretary of Agriculture the authority to issue orders governing the handling of agricultural commodities, *see* 7 U.S.C. § 608c(1), including milk, *see* 7 U.S.C. § 608c(5), through a system of marketing orders applicable to a designated region. To achieve equality among producers of milk, the marketing or-

---

**2.** Generally speaking, a "producer" is a person or entity who collects the milk directly from the animals, and a "handler" is a person or entity who takes this milk and turns it into an end product, and then resells it to either consumers or manufacturers.

ders create a market-wide pricing pool for handlers. The marketing order sets minimum prices that the handlers may pay for the basic classes of milk. Handlers who deal primarily in high grade, or "fluid" milk, which is used to produce milk intended for drinking, pay into a pool that is then drawn on by the handlers of the lower grade milk, or "surplus." Producers then receive a uniform, or "blend,"[3] price from the handlers irrespective of the use to which their milk is eventually put. *See* 7 U.S.C. § 608c(5); *see generally Lehigh Valley Cooperative Farmers, Inc. v. U.S.*, 370 U.S. 76, 79–80, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) ("[T]he statute authorizes the Secretary to devise a method whereby uniform prices are paid by milk handlers to producers for all milk received, regardless of the form in which it leaves the plant and its ultimate use. Adjustments are then made among the handlers so that each eventually pays out-of-pocket an amount equal to the actual utilization value of the milk he has bought.").

The regulatory effect of this pool can be demonstrated by a simple example. Suppose Handler A purchases 100 units of Class I (fluid) milk from Producer A at the minimum value of $3.00 per unit. Assume further that Handler B purchases 100 units of Class II (soft milk products) milk from Producer B at the minimum value of $2.00 per unit, and that Handler C purchases 100 units of Class III (hard milk products) milk from Producer C at $1.00 per unit. Assuming that this constitutes the entire milk market for a regulatory district, during this period the total price paid for milk is $600.00, making the average price per unit of milk $2.00. Thus, under the regulatory scheme, Producers A, B, and C all receive $200.00 for the milk they supplied, irrespective of the use to which it was put. However, Handler A must, in addition to the $200.00 that it must tender to Producer A, pay $100.00 into the settlement fund because

the value of the milk it purchased exceeded the regulatory average price. Along the same vein, Handler C will receive $100.00 from the settlement fund because it will pay Producer C more than the milk it received was worth. The pool achieves equality among producers, and uniformity in price paid by handlers.

Although, generally speaking, the regulatory scheme closely monitors the conduct of handlers, a certain category of handlers is exempt from participation in the pricing pool. The Secretary has chosen not require those entities that both produce and handle their own milk to make payments into the pool.[4] The regulations designate such entities as "producer-handlers." "Typically, a producer-handler conducts a small family-type operation, processing, bottling and distributing only his own farm production." Decision on Proposed Amendments to Tentative Marketing Agreements and to Orders, 25 Fed.Reg. 7819, 7825 (Aug. 16, 1960). The rationale for this exemption is "that such businesses are so small that they have little or no effect upon the pool." *Id.*

The effects of this exemption are twofold. First, if the producer-handler uses all the milk it produces as Class I milk, it avoids having to make payments into the producer settlement fund; it merely sells the milk at the market price, which is tempered only by the production costs. Assuming all other conditions are equal, the exemption allows the producer-handler to make a greater profit because it sells Class I milk without having to pay the full Class I price into the settlement fund.

The second effect of the exemption is upon the pool as a whole. Because the total amount of Class I milk purchased in a marketing area is a factor in calculating the aggregate blend price for the marketing area, removing a handler's Class I purchases from the calculus brings the aggregate price

---

3. The blend price is adjusted by a number of factors, none of which are germane to this proceeding.

4. The basis for enacting the AMAA is the Commerce Clause, and the nexus to interstate commerce is the handlers and not the producers, whose operations are generally local. *See Dairylea Cooperative, Inc. v. Butz*, 504 F.2d 80, 83 (2d

Cir.1974) ("Though the act affects producers, it was designed to regulate handlers only."). Although a producer-handler is not subject to participation in the pool, it is an entity within the purview of the AMAA. *See id.* at 83 n. 6 ("When a producer acts as a handler he is not so exempted.").

down. Exemption of a handler who purchases a significant quantity of Class I milk from producers in the pool depresses the blend price in the region.

This exemption may also provide an additional windfall to producer-handlers who "ride the pool." This term refers to a producer-handler who draws upon pool resources to compensate for any deficiency in its own supply during the lean production months, thereby allowing the producer-handler to maintain a relatively smaller supply of animals with a minimal surplus of milk in periods of greater production. Producer-handlers could also take advantage of the price regulation by "riding the pool" if they do dispose of any surplus because the milk they dispose of most likely is used as Class II or Class III milk, but the producer-handler is still able to collect the relatively higher blend price. Thus, in theory, producer-handlers who "ride the pool" could reap the benefits of the regulatory scheme without sharing the burdens.

The instant lawsuit concerns the scope of the producer-handler exemption from the regulatory pool in Connecticut. Petitioner, who operates a dairy retail store in Norwalk, Connecticut, because of a lease with Oakridge Farm executed on December 10, 1997, which was superseded by a subsequent lease executed on June 16, 1998, claims that it should be classified as a producer-handler. The lease provided that:

1. Stew Leonard's hereby leases from Oakridge Farm its entire herd of milking cows at the rate of $1.00 per cow per day. Payment will be made on a monthly basis. In determining whether a cow is deemed to be part of Oakridge Farm's herd of milking cows, a cow shall be so counted from the date it is first milked until it is culled or dies. Inventory will be established on the last day of each month and verified by the DHI (Dairy Herd Management Services) records. Stew Leonard's agrees to replace culls and/or attrition with newly bred heifers.

2. In addition to the foregoing lease rate, Stew Leonard's hereby leases from Oakridge Farm its barns, milking parlors, personal property and all equipment necessary to produce raw milk and its related products for $12,000 a month. Stew Leonard's agrees that it will transport the milk products from Oakridge Farm to its facilities for processing, packaging, sale and distribution at its own expense.

3. In addition to the foregoing lease rate, Stew Leonard's agrees to pay for all ordinary and necessary expenses related to the production, processing, or packaging of milk. Also, Stew Leonard's agrees to assume all risk, responsibility, and maintenance of the cows, equipment, buildings, and labor. The aforesaid risks and responsibilities include, but are not limited to, life and death of all animals, damage and destruction resulting from acts of God (including storms, fires, pestilence, drought, etc.), damage and destruction resulting from employee negligence and/or malfeasance. Stew Leonard's agrees to buy corn silage from Bahler Farms, Inc. when needed. Stew Leonard's also agrees to pay Bahler Farms, Inc. a management fee of $2,000 per month.

4. The term of the agreement shall be for a term of two years. Advance written notice 60 days prior to change in ownership, or key management personnel by either Stew Leonard's or Oakridge Farm. If either Stew Leonard's or Oakridge Farm fails to approve of the aforementioned change, they will have the option to terminate the lease on the last day of the month of the change.

(Petition for Review of Agency Decision, Ex. G at 1–2). Petitioner believed that the lease transaction had the effect of creating one enterprise, which would then qualify petitioner for producer-handler status under the order.

In December of 1997, petitioner initially requested that the Market Administrator for the New England Marketing Order,[5] Erik

---

5. Since the initiation of the administrative proceedings, the Department of Agriculture has amended the nation-wide system of marketing orders by reducing the total number of market-

ing orders throughout the nation. *See* Milk in the New England and Other Marketing Areas; Order Amending the Orders, 64 Fed.Reg. 47898 (Sept. 1, 1999). Under this reorganization, the

Rassmussen, classify Stew Leonard's as a producer-handler under the order. Under the applicable provisions of this order, a producer-handler is defined as:

any person who, during the month, is both a dairy farmer and a handler and who meets all of the following conditions:

(a) Provides as the person's own enterprise and at the person's own risk the maintenance, care, and management of the dairy herd and other resources and facilities that are used to produce milk, to process and package such milk at the producer-handler's own plant, and to distribute it as route disposition.

(b) The person's own route disposition constitutes the majority of the route disposition from the plant.

(c) The quantity of route disposition in the marketing area from the person's plant is greater than in any other Federal marketing area.

(d) The producer-handler receives no fluid milk products except from such handler's own production and from pool handlers, either by transfer or diversion pursuant to § 1001.15. If the producer-handler's receipts from own production and the total route disposition from the producer-handler's plant each exceed 4,300 pounds per day for the month, the producer-handler's receipts from pool plants are not in excess of 2 percent of receipts from own production. For the purposes of this paragraph, the producer-handler's receipts of fluid milk products shall include receipts from plants of other persons at all retail and wholesale outlets that are located in a Federal marketing area and operated by the producer-handler, an affiliate, or any person who controls or is controlled by the producer-handler.

7 C.F.R. § 1001.10 (1999) *amended by* Milk in the New England and Other Marketing Areas; Order Amending the Orders, 64 Fed. Reg. 47898 (Sept. 1, 1999).[6]

After a period of correspondence with the Market Administrator, concerning various proposed changes to drafts of the leases, the Market Administrator declined to re-classify petitioner as a producer-handler in a letter dated February 6, 1998:

The office has reviewed the various leases you have proposed. The stated purpose of the leases is to change the regulatory status of Stew Leonard's Dairy from a handler operating a pool distributing plant that purchases milk from producers to status as a producer-handler.

There is precedent by this office to approve farm leases for a producer-handler. These approvals follow the needs of currently operating producer-handlers to utilize additional sites for expansion purposes.

The situation at Stew Leonard's Dairy is distinct from proposals received by some producer-handlers. You propose to construct a legal framework, with our assistance, that would allow you to circumvent the Agricultural Marketing Agreement Act, 7 U.S.C. 608(c)(5) [sic]. The determination has been made that the means you

---

former New England Marketing Order became part of the Northeast Marketing Area. *See* 7 C.F.R. § 1001.2 (2000).

**6.** This definition has been changed since the initiation of the administrative action in 1998. The new text reads as follows:

Producer-handler means a person who:
(a) Operates a dairy farm and a distributing plant from which there is monthly route disposition in the marketing area during the month;
(b) Receives milk solely from own farm production or receives milk that is fully subject to the pricing and pooling provisions of this or any other Federal order;
(c) Receives at its plant or acquires for route disposition no more than 150,000 pounds of fluid milk products from handlers fully regulated under any Federal order. This limitation shall not apply if the producer-handler's own farm production is less than 150,000 pounds during the month;
(d) Disposes of no other source milk as Class I milk except by increasing the nonfat milk solids content of the fluid milk products; and
(e) Provides proof satisfactory to the market administrator that the care and management of the dairy animals and other resources necessary to produce all Class I milk handled (excluding receipts from handlers fully regulated under any Federal order) and the processing and packaging operations are the producer-handler's own enterprise and at its own risk. 7 C.F.R. § 1001.10 (2000). The parties have not suggested that this version of the regulation applies. Therefore, the court will apply the prior version of the regulation.

propose to meet the producer-handler qualification under Section 1001.10(a) violate the letter and intent of the Act and this section.

> Stew Leonard's Dairy must continue to file handler reports as a pool distributing plant. If you wish to challenge this decision, refer to 7 U.S.C. 608(c)(15)(A) [sic].

(Administrative Record, Ex. 100, PX 14). On February 17, 1998, petitioner commenced the administrative action by filing a petition for relief from the Market Administrator's February 6, 1998 determination pursuant to 7 U.S.C. § 608c(15)(A).[7]

The Secretary affirmed the Market Administrator's February 6, 1998 determination. On January 11 and 12, 1999, the parties presented evidence and testimony before an Administrative Law Judge ("ALJ"), who dismissed the petition and affirmed the decision of the Market Administrator. Petitioner then appealed to the Secretary of Agriculture, who, through a designated Judicial Officer, after modifying the ALJ's decision in some areas, also affirmed the decision of the Market Administrator on March 16, 2000.[8] Petitioner then commenced the instant action on April 4, 2000 pursuant to 7 U.S.C. § 608c(15)(B).[9]

## B. REVIEW OF THE SECRETARY'S DECISION

The question before the court is whether the Market Administrator's classification of Stew Leonard's as a handler, and not a producer-handler, which was adopted by the Secretary after completion of the administrative review process, was "in accordance with the law" under 7 U.S.C. § 608c(15)(B). The Secretary held that

> 1. Petitioner is a "handler," as defined in section 1001.9 of the New England Marketing Order (7 C.F.R. § 1001.9).
>
> 2. Petitioner is not a dairy farmer.
>
> 3. Petitioner does not provide, as Petitioner's own enterprise and at Petitioner's own risk, the maintenance, care, and management of the dairy herd or other resources and facilities used to produce milk, which Petitioner leases from Oakridge Farm.
>
> 4. Petitioner is not a "producer-handler," as defined in section 1001.10 of the New England Marketing Order (7 C.F.R. § 1001.10).
>
> 5. The Market Administrator's determination that Petitioner is not a "producer-handler," as defined in section 1001.10 of the New England Marketing Order (7 C.F.R. § 1001.10), is in accordance with the law.

(Administrative Record, Ex. 88 at 62–63). Petitioner contends that the Secretary's decision was not in accordance with the law because it is arbitrary and capricious, in that the Secretary's ultimate decision is not supported by the weight of the evidence, and flies in the face of its prior action concerning classification of entities as producer-handlers.

The scope of the court's review is set forth in the Administrative Procedure Act, which states that

> [t]he reviewing court shall decide all relevant questions of law, interpret constitutional or statutory provisions, and deter-

---

**7.** Such section provides:

Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with the law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with the regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with the law.

7 U.S.C. § 608c(15)(A).

**8.** The administrative petition was amended to reflect the superseding lease executed on June 16, 1998. This version was the subject of the administrative review proceedings, and, consequently, is the subject of this court's review as well.

**9.** This provision states, in pertinent part, that:

The District Courts of the United States ... are vested with jurisdiction in equity to review [the Secretary's] ruling.... If the court determines that such ruling is not in accordance with the law, it shall remand such proceedings to the Secretary with directions....

7 U.S.C. § 608c(15)(B).

mine the meaning or applicability of terms of an agency action. The court shall... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ... [or] unsupported by substantial evidence....

5 U.S.C. § 706(2)(A) & (E). Cognizant of this standard, the court now turns to the precise issues in dispute.

### 1. SECRETARY'S INTERPRETATION OF 7 C.F.R. § 1001.10

■ A threshold issue is whether the law the Secretary eventually applied to reach his decision is a valid exercise of agency power. Petitioner states that

[t]he administrator admitted under oath that the term "dairy farmer" is not defined anywhere in the regulations. Tr. at 298. The administrator has the sole power, without regulatory guidance, to decide what is and is not a dairy farmer. By failing to define a critical term within the definition of "producer-handler," the regulations themselves cede unlimited arbitrary authority to the administrator.

(Petitioner's Cross–Mot. for S.J. at 3 n. 3). In addition, petitioner contends that respondent's interpretation of the regulation is contrary to the purpose of the governing statutory scheme. (See Petitioner's Cross–Mot. for S.J. at 22–23). Thus, petitioner argues that respondent's construction of the regulation is legally deficient.[10]

When determining if an agency's construction of a regulation is legally permissible, the analysis is governed by the Supreme Court's decision in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See New York Currency Research Corp. v. Commodity Futures Trading Comm'n, 180 F.3d 83, 88 (2d Cir.1999) ("Although Chevron dealt only with an agency's interpretation of relevant federal statutes, similar principles apply to judicial review of an agency's interpretation of its own regulations."). Pursuant to this framework, the reviewing court asks two questions. See id. at 842, 104 S.Ct. 2778. First "is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43, 104 S.Ct. 2778. If this first question is answered in the negative, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778. The agency's interpretation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. 2778.

Because the governing statute, 7 U.S.C. § 608c(5), is silent on the determination of exemptions to the regulatory pricing pool, it is the second inquiry set forth in Chevron that applies here. In such a situation, the court must afford "substantial deference to the agency's interpretation of its own regulations," and must give the interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted). "In other words, [the court] must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent, at the time of the regulation's promulgation." Id. (internal quotation marks omitted). This deference to the agency is especially important when "the regulation concerns a complex and highly technical regulatory program...." Id. (internal quotation marks omitted).

The Secretary has narrowly construed the definition of producer-handler set forth in the

---

**10.** The ALJ, despite affirming the Market Administrator's decision, alluded to the fact that the degree of discretion afforded the Market Administrator in defining the precise contours of the producer-handler exemption to the regulatory pricing pool may not be legally permissible. (See Petition for Review of Agency Decision, Ex. I at 37 ("Lack of specificity in the regulations allow unlimited authority to the Market Administrator and provide fertile ground of uncertainty for those subject to his regulation.")).

regulations. The pertinent part of the regulation reads as follows:

> [p]roducer-handler means any person who, during the month, is both a dairy farmer and a handler and who meets all of the following conditions:
>
> (a) Provides as the person's own enterprise and at the person's own risk the maintenance, care, and management of the dairy herd and other resources and facilities that are used to produce milk, to process and package such milk at the producer-handler's own plant, and to distribute it as route disposition.

7 C.F.R. § 1001.10 (1999) *amended by* Milk in the New England and Other Marketing Areas; Order Amending the Orders, 64 Fed. Reg. 47898 (Sept. 1, 1999). On its face, the regulation requires that, in order to be considered a producer-handler, an entity must be a dairy farmer, and must produce milk through its own enterprise and at its own risk.

When considering the criteria listed in the regulation as applied to leases, the Secretary has declined to state that a handler entering into a lease transaction with a producer can never pass muster, but has consistently held that such arrangements do not warrant reclassification of a handler as a producer-handler. The Secretary maintains that such transactions, despite the fact that they often appear to meet the criteria in the regulation, do not in fact meet the test because they are often constructed for the purpose of escaping regulation, and therefore it must interpret the regulation strictly, in order to avoid the circumvention of the regulatory scheme. (*See* Petition for Review of Agency Decision, Ex. J at 27–28, 36 ("[A] handler that tries to circumvent the milk pricing regulations by claiming to lease or purchase a farm, while in reality simply buying milk, does not obtain producer-handler status.")).

This interpretation of the regulation is consistent with the plain language and also is faithful to the Secretary's intent at the time of the regulation's promulgation. In 1960, when the producer-handler concept as it now stands was promulgated, the Secretary offered the following explanation:

> Typically, a producer-handler conducts a small family-type operation, processing, bottling and distributing only his own farm production. Full regulation of such individuals provides considerable administrative difficulties. Normally, exemption from regulated status is made in a Federal order for such individuals on the grounds that such businesses are so small that they have little or no effect on the pool.
>
> \* \* \* \* \* \*
>
> In order to maintain producer-handler status, it is provided that the maintenance, care and management of the dairy animals and other resources necessary to produce the milk, and the processing, packaging and distribution of the milk shall be the personal enterprise of and the personal risk of the person involved. These standards are intended to distinguish the family-type operation normally involved, and to bring under full regulation operations which attempt to masquerade as those of producer-handlers in their normal concept through leases, rental arrangements, and other devices designed to circumvent regulation by the order.

Decision on Proposed Amendments to Tentative Marketing Agreements and to Orders, 25 Fed.Reg. 7819, 7825 (Aug. 16, 1960). This explanation provides conclusive support for the Secretary's careful policing of its regulatory pricing scheme by strictly construing the definition of producer-handler.

Petitioner maintains that the Secretary's interpretation of the regulations is not consistent with the purpose of the legislation because the Secretary's strict construction of the requirements hinders petitioner's stated purpose for entering the lease transaction: to exercise control over the production of the milk so that it may implement a rigorous quality control program that far exceeds any mandatory regimen. Petitioner presented a great deal of evidence to this effect at the administrative hearing, and now argues that

> [t]he market administrator effectively seeks to penalize Stew Leonard's by making it bear the cost of a regulatory program even though such regulation of Stew Leonard's a self-contained enterprise that simply produces milk and sells it at retail

would not serve the purpose of the program. The administrator seeks to bring Stew Leonard's back into the fold, such that Stew Leonard's would presumably resume purchasing lower quality milk from the dairy cooperative that once supplied its milk, and Oakridge Farm would resume selling its high-quality milk to the dairy cooperative to be blended with and diluted by the lower-quality milk of other farms. (Petitioner's Cross–Mot. for S.J. at 24). As such, petitioner claims that failing to interpret the definition of producer-handler to include arrangements such as the one in the instant case serves as a deterrent to handlers such as Stew Leonard's inventing creative solutions to produce a higher quality product.

The fact that petitioner can meet its quality-control objectives under its current classification, albeit at a higher production cost, fatally undermines this argument. The evidence in the record demonstrates that conferring producer-handler status upon petitioner is not necessary to achieve the high quality product desired by Stew Leonard's; indeed, the fact that the present arrangement results in the production of a superior product was not disputed at any time in the hearing, but the fact that petitioner has been able to manufacture this superior product while still participating in the pricing pool precludes any causal connection between the status of producer-handler and the statutory objective of producing wholesome milk. Reprieve from the regulatory pool would lower the production costs for Stew Leonard's, but the purpose of the act is to promote the production of wholesome milk, and not to promote the production of wholesome milk at the lowest possible cost to the handler.

The Secretary's construction of the applicable regulation is in accordance with the law. It follows the plain language of the text, is consistent with the expressly stated purpose for the exemption, and does not betray the purpose of the AMAA.

## 2. SECRETARY'S APPLICATION OF THE REGULATIONS

Having decided that the construction of the law the Secretary was charged with applying was in accordance with the law, the court now turns to the question of whether the Secretary properly applied the evidence to the law.

The court reviews the agency's on-the-record findings in such cases under the "substantial evidence" test, as set forth in 5 U.S.C. § 706(2)(E): "[t]he court shall... hold unlawful and set aside agency action, findings, and conclusions found to be ... unsupported by substantial evidence...." [11] "[S]ubstantial evidence is more than a mere scintilla," and "must do more than create a suspicion of the existence of the fact to be established." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (citations, internal quotation marks omitted). The quantum of evidence, viewing the record as a whole, must be such that "it would have been possible for a reasonable jury to reach the [Secretary's] conclusion." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998). Thus, "[e]ven if a court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence." *Kinney Drugs, Inc. v. N.L.R.B.*, 74 F.3d 1419, 1427 (2d Cir.1996) (citations, internal quotation marks omitted); *see also Allentown Mack Sales & Service, Inc.*, 522 U.S. at 377, 118 S.Ct. 818 (noting that the substantial evidence standard "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder.").

11. The type of on-the-record adjudication present in this case, where the court's review is confined to the formidable administrative record developed below, warrants application of the "substantial evidence" standard of review, to the extent it differs in substance from the "arbitrary and capricious" standard. *See, e.g., In re Gartside,* 203 F.3d 1305, 1314 (Fed.Cir.2000) (applying the more specific "substantial evidence" standard rather than the general "arbitrary and capricious" standard because "our review of the Board's decision is confined to the factual record compiled by the Board in the underlying adjudicative proceeding"); *Ass'n of Data Processing v. Bd. Of Governors,* 745 F.2d 677, 683–86 (D.C.Cir. 1984) (characterizing the difference between the two standards as "largely semantic").

Petitioner contends that the Secretary's decision should be reversed for two reasons. First, it argues that the Secretary's finding that petitioner did not meet the requirements of the definition of producer-handler is not supported by the weight of the evidence in the record. Second, petitioner maintains that the Secretary's decision is disingenuous because it flies in the face of prior departmental precedent.

The gravamen of petitioner's first contention is that the evidence shows that the lease in question gives it a great degree of control over the farming operations, and shifts a significant amount of risk from the Bahlers, the family who owns Oakridge Farm, to Stew Leonard's. Also, petitioner points out that it operates in the intuitively precarious position of paying rent for animals and equipment at a monthly rate, in addition to the monthly expenses of running the farm, and then has to conduct its accounting in such a way that complies with the federal regulatory pricing scheme. Petitioner maintains that, because of the logistics of this arrangement, and the fact that it contractually assumes much of the risks of conducting a farming operation, it should be considered one enterprise under the marketing order.

However, the Secretary's decision is supported by substantial evidence. The Secretary adequately considered both the evidence that supported petitioner's contention, and the evidence that bolstered the Market Administrator's decision. He examined the terms of the effective lease, which provides that "Stew Leonard's agrees to pay for all ordinary and necessary expenses related to the production, processing and packaging of milk," and that "Stew Leonard's agrees to assume all risk, responsibility and maintenance of the cows, equipment, buildings, and labor," (Petition for Review of Agency Decision, Ex. G, ¶ 3). He also noted the fact that Stew Leonard's "has paid the cost of fertilizing cows, hardware maintenance and repair,

equipment repair, feed, payroll, veterinary services, and services to keep track of animals," (Petition for Review of Agency Decision, Ex. J, ¶ 23 at 19), and that Stew Leonard's maintains insurance on Oakridge Farm, (*see id.*). The Secretary's findings to this effect were consistent with the evidence produced at the hearing.[12]

In spite of these findings, substantial evidence exists to support the conclusion of the Secretary. Specifically, the Secretary found that, despite the indicia of control discussed above, petitioner was not a dairy farmer who operated his own enterprise at his own risk. (*See* Petition for Review of Agency Decision, Ex. J at 27 ("The evidence establishes that Petitioner is not a dairy farmer ... and that Petitioner does not provide, at Petitioner's own risk, the maintenance, care, and management of the Oakridge Farm Dairy herd and other resources and facilities used to produce milk....")). The Secretary found that Stew Leonard's has no interest in the land itself under the terms of the lease. (*See id.*, ¶ 30). In addition, the Secretary found that Oakridge Farm, which is the entity with which Stew Leonard's entered into the lease, retains a significant connection to Bahler Farms, Inc. an adjacent farm operation, in that the principals of Bahler Farms, Inc., are authorized to write checks for Stew Leonard's (*see id.*, ¶ 25), records for Oakridge Farms are maintained at Bahler Farms, Inc. (*see id.*, ¶ 27), the two operations purchase supplies jointly (*see id.*, ¶ 26), and the two entities share "equipment and a full-time calf raiser, a mechanic, and full-time milkers," (*see id.*, ¶ 24). Oakridge and Bahler also pledged security for a loan together (*see id.*, ¶ 28), and jointly insure against a loss resulting from the joint operation (*see id.*, ¶ 29). Finally, the evidence shows that Stew Leonard's does not know how to operate a dairy farm (*see id.*, ¶ 33), and that the day-to-day operation of Oakridge Farm did not change

---

12. Petitioner argues that the Secretary erroneously refused to adopt the ALJ's finding that "Stew Leonard's has also assumed, pursuant to the June 16, 1998, lease, all risks arising from the operation of Oakridge Farm." (Petition for Review of Agency Decision, Ex. I, ¶ 25). The Secretary was free to examine the evidence and

decline to adopt this finding, and properly did so. The court is obligated to consider this disagreement when reviewing the evidence in the record, *see Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951), yet finds that the evidence supports the Secretary's conclusion.

**58**

at all after the execution of the lease (*see id.*, ¶ 37).[13]

This evidence is sufficient for a reasonable jury to conclude that Stew Leonard's does not operate a dairy farm as its own enterprise and at its own risk. Although, without question, the lease places Stew Leonard's in a position to take a more active role in the production of the milk it sells, the evidence supports the conclusion that the lease had very little practical effect upon the symbiotic operation of Oakridge Farm and Bahler Farms, Inc. In this respect, the scenario closely resembles the ordinary purchase and sale of milk. Given the evidence presented, a reasonable conclusion to draw would be that, despite the fact that the lease was not a sham, Stew Leonard's is actually a handler posing as a producer-handler.

Petitioner, in a vigorous cross-examination of Erik Rassmussen, the Market Administrator of the New England Marketing Order at the time of the hearing, explored, at length, the limits and legal ramifications of the Market Administrator's knowledge and views concerning how much control and assumption of the risk of loss is necessary to be classified as a producer-handler. Although informative, the testimony elicited during the hearing from Mr. Rassmussen does not detract from his ultimate conclusion. Counsel for the petitioner asked pointed questions about complicated legal intricacies regarding the forms of business organizations and the distinctions between a lease and a transfer of property. Mr. Rassmussen admitted that he was not a lawyer, and, indeed, familiarity with these legal concepts is not qualification of his position; his job is to look at the circumstances as a whole, under the guidance of the provisions and purpose of the regulatory scheme, in order to make an informed practical determination. He does not have to explore every legal consequence of the transaction, or refute all indicia of control, rather he must use his knowledge and experience to determine if, practically speaking, the entity in question is a dairy farmer who conducts his operation at his own risk, or a handler who has donned a clever disguise as a producer-handler. *See Elm Spring Farm, Inc. v. U.S.*, 127 F.2d 920, 926 (1st Cir.1942) ("The regulatory scheme embodied in the Order is an intensely practical business, and the question now before us is not to be determined by a purely abstract inquiry as to who had 'title' to the cows which produced the milk.").

This emphasis on the practical effect is faithful to the purpose of the producer-handler exemption. The Secretary found that classifying Stew Leonard's as a producer-handler would have an impact upon the market as a whole.[14] Specifically, the Secretary found that Stew Leonard's would enjoy a competitive advantage over its rival milk handlers in the area by avoiding the pool equalization payments. (*See* Petition for Review of Agency Decision, Ex. J, ¶ 34). Furthermore, the Secretary found that this advantage would effect the market as a whole, (*see id.*, ¶ 34), and that the size of Stew Leonard's operation could not be considered small, (*see id.* at 31). As previously noted, the purpose of the exemption was to forgo the regulation of smaller family-type operation because these operations do not have a significant effect upon the pricing pool, and therefore the burdens of regulating them outweigh the benefits to the regulatory pool. When an entity does have an effect upon the pricing pool, as a reasonable conclusion from the evidence suggests Stew Leonard's does, the purpose of the exemption would be defeated.

Petitioner's second contention is that the Secretary's application of the producer-handler definition contradicts prior departmental decisions. In particular, petitioner presented evidence that three entities currently classified as producer-handlers lease a portion of

---

**13.** Petitioner argues that the evidence connecting Bahler Farms, Inc. to Oakridge Farm should not be considered because the Market Administrator was not aware of these facts and consequently could not have based his initial determination upon this evidence. However, the statute clearly states that the court is to review the Secretary's decision, and not the Market Administrator's initial determination. Therefore, the court will consider the disputed evidence.

**14.** This effect does not include "riding the pool" as discussed elsewhere in this opinion. No evidence suggests that Stew Leonard's would take unfair advantage of being awarded producer-handler status by "riding the pool."

their dairy herd, yet assume significantly less risk than that assumed under the terms of petitioner's lease. Petitioner argues that, because "[t]he Market Administrator concedes these leases do not provide, as their own enterprise and at their own risk, the maintenance, care, and management of the leased cows and other resources and facilities used to produce the milk from the leased cows," (Petition for Review of Agency Decision, Ex. J, ¶ 32), that respondent's finding that petitioner is not a producer-handler is contradictory to prior departmental actions.

The basis of petitioner's argument is that because the producer-handler lessees in the three other leases assume a lesser degree of risk than petitioner, petitioner should be granted producer-handler status. However, petitioner dismisses one key fact: the three producer-handler lessees were classified as producer-handlers prior to the execution of the leases. (See id.). This is certainly a credible reason for distinguishing between the other three leases and petitioner's; the three producer-handler lessees could not be accused of constructing a legal framework to avoid payments into the pricing pool, because, as producers and dairy farmers,[15] they were never subject to the pricing pool in the first place. Allowing existing producer-handlers to lease a portion of their dairy herd is entirely consistent with the express purpose of the producer-handler exemption because regulation of smaller dairy farms would have a nominal effect upon the pricing pool, even if they do supplement their milk production to some degree.[16]

Petitioner also cites a previous decision by the Secretary that classified an entity as a producer-handler despite the fact that its entire dairy herd was leased, and claims that, under this precedent, the Secretary's decision not to classify Stew Leonard's as a

producer-handler would be unreasonable. Petitioner contends that there is no foundation for the Secretary's conclusion that an existing producer-handler can lease a herd, but a handler may not become a producer-handler through a lease transaction. Because there is a substantial basis for distinguishing the case in question, petitioner's argument fails.

In the case in question, *In re Jerome Klocker,* 26 Agric. Dec. 1050 (Oct. 30.1967), the petitioner had "been the sole owner of all land, buildings, machinery, equipment and facilities of both the dairy farm and milk processing plant located thereon," *id.* at 1051, until he engaged in a sale and lease-back arrangement with a herdmaster in which petitioner sold his heifers to one Rausch, who then leased the herd back to petitioner, *see id.* The Secretary found that the transaction had no practical effect upon the operation of the farm; the herd was never moved off petitioner's property, Rausch was essentially an employee of the petitioner, and all the milk was produced from this herd in petitioner's facilities. *See id.* at 1051, 1055, 1057.

Upon consideration of these facts, the Secretary reversed the decision of the market administrator and retained petitioner's classification as a producer-handler. In so finding, the Secretary noted that "[a]dmittedly, the use of milk from a leased herd is not determinative of the question of satisfaction of the requirements of the 'producer-handler' definition contained in the order," and held that, "[p]etitioner exercised the powers of management, supervision, direction and control of the dairy herd and farm and such farm was his investment or risk," and "the production of the milk utilized at petitioner's plant continued to be the enterprise and risk of peti-

---

15. The Secretary found that "[e]very producer-handler in the New England Milk Marketing Order is a dairy farmer who owns a dairy farm." (Petition for Review of Agency Decision, Ex. J, ¶ 31).

16. Petitioner challenges the Market Administrator's determination that a producer-handler who lease more than twenty-five percent of his dairy herd can no longer be considered a producer-handler, (*see* Petition for Review of Agency Deci-

sion, Ex. J, ¶ 32), and claims that this ad hoc determination is exemplary of the alleged abuse of the Market Administrator's power. This court is concerned with review of Stew Leonard's petition, which does not turn on the validity of the twenty-five percent line. For the purposes of this review, the court finds a substantial justification for drawing such a line in general, and does not pass on precisely where it should be drawn.

tioner subsequent to the [leaseback] ....." *Id.* at 1057–58.

The factual differences between *Klocker* and this case are manifest. In *Klocker*, the petitioner operated his own dairy farm and processing plant, but had a peculiar method of paying his herdmaster, a method that had no practical effect upon the operation of the farm for the purpose of the administration of the marketing order. In the instant case, petitioner never owned a dairy farm, and then leased the animals and fixtures, in addition to assuming some risk associated with the farm's operation, but the practical effect upon the operation of the farm for the purpose of the administration of the marketing order did not change. A fair reading of the case suggests that the Secretary should not elevate form over substance, and should, instead, look to the practical effect upon the regulatory scheme with which he is charged to implement. Viewed in this light, the state of affairs prior to the lease transaction, contrary to petitioner's assertions, is certainly a critical issue, and a permissible basis for differentiating between the cases. Such a reading supports the Secretary's decision in this case.

In sum, the Secretary's application of the governing regulation is supported by substantial evidence and therefore is "in accordance with the law." The Secretary has a duty to enforce the provisions of the AMAA, in such a way that adheres to the purpose of the act: to avoid ruinous pricing practices in the several market areas. The Secretary's decision in this case was faithful to that purpose, and also was consistent with prior departmental action. The Secretary found that Stew Leonard's, under the terms of the operative lease, was not the type of entity deserving of exemption from the regulatory pricing pool because it had a cognizable impact upon the pricing pool, and the evidence showed that it did not assume the degree of risk necessary to be deemed a producer-handler.

As an aside, petitioner raises some concerns, echoed somewhat by the ALJ, regarding the determination of producer-handler status, in particular the gaps left in the text of the regulations regarding the lack of a definition of "dairy farmer" and the process for ascertaining where the line should be drawn with respect to the permissible percentage of outside milk handling by existing producer-handler leases. However, petitioner's concerns merely re-state a familiar problem: because Congress, or even the Secretary of Agriculture, cannot construct a legislative solution to every conceivable issue, much of the classification process is left to administrative discretion. Although some may lament this reality, courts have consistently held that it is lawful:

> [a] statute may be ambiguous, for the purposes of *Chevron* analysis, without being inartful or deficient. The present case exemplifies the familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect.

*U.S. v. Haggar Apparel Co.*, 526 U.S. 380, 392, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999). A reviewing court must confine its review to the legality, and not the desirability, of the agency's action.

## C. EQUAL PROTECTION

 Petitioner claims that the Secretary's decision to deny Stew Leonard's producer-handler status is unconstitutional. It claims that the Secretary violated the equal protection guarantees of the Fifth Amendment when it granted producer-handler status to operations that lease a portion of their dairy herd, without assuming a significant portion of the risks involved, and refused to grant producer-handler status to petitioner, who leased a herd that fulfills all its processing demands, while assuming a significant portion of the risks involved.

The Fourteenth Amendment of the United States Constitution states that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."[17]

---

**17.** "We approach equal protection claims under the Fifth Amendment in the same way as we would such claims under the Fourteenth Amendment." *General Media Communications, Inc. v.*

*Cohen*, 131 F.3d 273, 285 (2d Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998) (citing *Weinberger v. Wiesen-*

U.S. Const. Amend. XIV, § 1. This constitutional guarantee ensures that "all similarly situated persons are treated similarly under the law," such that "[i]f a [regulation] classified people, the classification must be based on criteria related to the [regulation's] objective." *Vermont Assembly of Home Health Agencies, Inc. v. Shalala*, 18 F.Supp.2d 355, 363 (D.Vt.1998).

In determining if this guarantee has been infringed, a reviewing court must apply the appropriate standard. The Supreme Court instructs reviewing courts as follows:

> In areas of social and economic policy, a[ ] classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable set of facts that could provide a rational basis for the classification.

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Since the case before the court concerns areas of social and economic policy, and does not involve suspect classifications or fundamental constitutional rights, the court will apply the minimum rationality standard. *See id.*

When applying the minimum rationality standard, a regulatory classification "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The Secretary has no obligation to promulgate evidence in support of its decision, and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* at 320, 113 S.Ct. 2637 (internal quotation marks omitted), *see also Able v. U.S.*, 155 F.3d 628, 632 (2d Cir.1998) (applying the same standard). In sum, "[w]here there are plausible reasons for [the Secretary's] action, our inquiry is at an end." *Beach Communications*, 508 U.S. at 314, 113 S.Ct. 2096 (internal quotation marks omitted).

The court finds a plausible and legitimate reason for the difference in treatment. As discussed herein, the Secretary's decision

was based upon substantial evidence. As such, petitioner cannot sustain its burden of disproving any rational explanation for the difference in treatment.

### III. *CONCLUSION*

Petitioner has failed to demonstrate that the defendant's decision to deny it producer-handler status under the applicable regulations is not supported by substantial evidence, and therefore "not in accordance with the law," 7 U.S.C. § 608c(15)(B). Likewise, petitioner has not shown that defendant's application of the statutory scheme lacks a rational basis. Therefore, the decision of the Secretary of Agriculture is **AFFIRMED**, petitioner's motion for summary judgment is **DENIED**, and respondent's motion for summary judgment is **GRANTED**. The Clerk of the Court shall enter judgment for the respondent on all counts.

**IT IS SO ORDERED.**

*feld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)).